Margaret DONG, Appellee,

v.

SMITHSONIAN INSTITUTION, Hirsh-
horn Museum & Sculpture Gar-
den, Appellant.

No. 96–5303.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 5, 1997.

Decided Oct. 17, 1997.

Rehearing Denied Dec. 3, 1997.

Nancy R. Page, Assistant U.S. Attorney, Washington, DC, argued the cause for appellant. With her on the brief was Eric H. Holder, Jr., U.S. Attorney at the time the brief was filed, and R. Craig Lawrence, Assistant U.S. Attorney.

Joseph Kaplan, Washington, DC, argued the cause for appellee. With him on the brief was John P. Mahoney, Washington, DC.

Before WILLIAMS, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Margaret Dong brought this action against her employer, the Smithsonian Institution, for damages under the Privacy Act, 5 U.S.C. § 552a. The district court found the Smithsonian liable and awarded plaintiff $2,500 in compensatory damages. *Dong v. Smithsonian Institution*, 943 F.Supp. 69 (D.D.C.1996). The Smithsonian appeals from the district court's determination that it is an "agency" subject to the Privacy Act. *Dong v. Smithsonian Institution*, 878 F.Supp. 244 (D.D.C. 1995). Alternatively, it argues that even if it is covered by the Act, its conduct toward plaintiff was not "intentional or willful" as required for imposition of damages under the Act. 5 U.S.C. § 552a(g)(4). We reverse.

\* \* \*

Plaintiff began working at the Hirshhorn Museum and Sculpture Garden in 1985. She currently holds the position of Museum Registration Specialist, which means that her duties include serving as a courier for works of art the Hirshhorn lends to other museums. Museum procedures require employees to obtain permission from the director of the Hirshhorn before acting as a courier. In September 1993, without seeking permission, plaintiff took annual leave and accompanied the painting *Circus Horse* by Joan Miro from Barcelona to the Museum of Modern Art ("MOMA") in New York City. At trial she testified that she deliberately failed to re-

quest approval for her trip, even though she had never had such a request denied in the past. Apparently her purpose was to avoid friction with a co-worker, who in her view made trouble when plaintiff was away on courier duty, but not when she simply took annual leave.

Rumors of plaintiff's unauthorized journey soon reached the administrator of the Hirshhorn, Beverly Pierce, and plaintiff's immediate supervisor, Douglas Robinson. Through conversations with the registrar at MOMA and an employee of New York's Metropolitan Museum of Art who had worked at MOMA at the time of plaintiff's trip, Pierce and Robinson eventually substantiated the story. Both supervisors testified that they telephoned New York (rather than directly confront plaintiff) because they were aware of tensions in the Hirshhorn office where plaintiff worked, and wanted to put the rumors to rest without creating any additional workplace difficulties. When the rumors proved true, Pierce and Robinson approached plaintiff, who admitted taking the trip. She was suspended for five days.

In March 1994 plaintiff instituted this action against the Smithsonian under the Privacy Act, which requires federal agencies, when gathering information that may lead to an adverse determination about an individual, to obtain that information directly from the individual "to the greatest extent practicable." 5 U.S.C. § 552a(e)(2); see *Waters v. Thornburgh*, 888 F.2d 870 (D.C.Cir.1989). Damages are available under the Privacy Act for "intentional or willful" violations. 5 U.S.C. § 552a(g)(4). The Smithsonian defended on the theory that it is not an "agency" subject to the Act. In the alternative, it contended that its conduct could not be described as intentional or willful given its reasonable belief that the Act did not apply to it. Finally, the Smithsonian argues that even if the Privacy Act applied and even if its understanding to the contrary were not exculpatory, Pierce and Robinson's decision not to obtain information from the plaintiff in the first instance stemmed from a good faith

belief that intra-office tensions rendered such a direct confrontation impracticable.

The district court rejected all of the Smithsonian's arguments. It found that the Smithsonian "has sufficient federal ties and control, as well as independent authority, to compel a finding of agency status under the Act." *Dong*, 878 F.Supp. at 248. The district court also held that the Smithsonian had intentionally or willfully violated the Act, saying that the institution was put on notice of its subjection to the Privacy Act by a 1992 district court opinion, *Cotton v. Adams*, 798 F.Supp. 22, 24 (D.D.C.1992), which found it to be an agency for the purposes of the Freedom of Information Act ("FOIA"), a statute whose definition of "agency" also governs the Privacy Act.

Because we hold that the district court erred in finding the Smithsonian to be an "agency" under the Privacy Act, we reverse without reaching its "intentional or willful" defenses.

\*     \*     \*

The Privacy Act requires "[e]ach agency that maintains a system of records" to gather information about a person directly from that person, to the greatest extent practicable. 5 U.S.C. § 552a(e)(2). The other requirements of the Act similarly apply to "agencies." See § 552a(b), (c), (d), (f).

Through § 552a(a)(1), the Act borrows the definition of "agency" found in FOIA, 5 U.S.C. § 552(f).[1] That definition in turn reads as follows:

> For purposes of this section, the term "agency" as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f). Section 552a(a)(1) cross-references 5 U.S.C. § 551(1), the definition of "agency" in the Administrative Procedure Act ("APA"), but does not explicitly incorpo-

---

**1.** Actually, § 552a(a)(1) refers to "agency as defined in section 552(e) of this title," but § 552(e)

has since been redesignated § 552(f).

rate it. Still, as the parties recognize, the Privacy Act encompasses not only all entities covered by § 552(f) but also all those described by § 551(1), which embraces any "authority of the Government of the United States, whether or not it is within or subject to review by another agency." Indeed, the additional language of § 552(f) was added to FOIA in 1974 "to encompass entities that might have eluded the APA's definition in § 551(1)." *Energy Research Foundation v. Defense Nuclear Facilities Safety Board*, 917 F.2d 581, 583 (D.C.Cir.1990).

■ Hence, to be an agency under the Privacy Act, an entity must fit into one of the categories set forth either in § 552(f) or § 551(1). Because we cannot see how the Smithsonian fits into any of them, we hold that it is not an agency for Privacy Act purposes.

Of the categories listed in § 552(f), the only ones that might be thought to cover the Smithsonian are "establishment in the executive branch" and "Government controlled corporation." It is plain that the Smithsonian is not an establishment in the executive branch. To begin with, nine of the seventeen members of its governing Board of Regents are appointed by joint resolution of Congress, 20 U.S.C. § 43, and six of the remaining eight *are* members of Congress, 20 U.S.C. § 42. (The other two are the Vice President and the Chief Justice of the United States, *id.*) Moreover, there is no evidence that the Secretary of the Smithsonian answers to the President, or that the institution administers federal statutes, prosecutes offenses, promulgates rules and regulations (other than with respect to its own buildings and grounds), or engages in any other typically executive activity. Indeed, if the Smithsonian were to wield executive powers, the method by which its Regents are appointed would appear to violate the Constitu-

tion's separation of powers principles. See U.S. Const., art. II, § 2, cl. 2; *Buckley v. Valeo*, 424 U.S. 1, 138–39, 96 S.Ct. 612, 691–92, 46 L.Ed.2d 659 (1976) (officeholders appointed by Congress may act only "in an area sufficiently removed from the administration and enforcement of the public law to permit their being performed by persons not 'Officers of the United States' "); *Metropolitan Washington Airports Authority v. Citizens for the Abatement of Aircraft Noise*, 501 U.S. 252, 275–76, 111 S.Ct. 2298, 2311–12, 115 L.Ed.2d 236 (1991).

Nor is the Smithsonian a "Government controlled corporation" within the meaning of the Privacy Act. There is much force to the Smithsonian's argument that the plain terms of the phrase itself simply do not encompass it. In particular, the Smithsonian contends that it is not "government-controlled" in the day-to-day sense required by our cases, see *Rocap v. Indiek*, 539 F.2d 174, 177 (D.C.Cir. 1976), and that it is not a "corporation," but rather a testamentary trust *res* denominated an "establishment" by Congress in 1846, 20 U.S.C. § 41. We find it unnecessary to address these arguments, however. Section 552(f) first identifies four specific categories—"any executive department, military department, Government corporation, Government controlled corporation"—and then uses a catch-all phrase to encompass similar entities not precisely fitting any of the four specific molds: "or *other* establishment in the executive branch" (emphasis added). Thus Congress evidently viewed the four specified classes as examples of "establishments in the executive branch," so that an entity clearly outside the executive branch would not qualify even if it could otherwise be shoehorned into the concept of a "Government controlled corporation." [2] This is the most logical reading of the statute; for those who collect canons of construction it might be termed an application of "reverse ejusdem generis

2. A 1993 report of the House Committee on Government Operations takes the same view of the first four entities listed in § 552(f). In a "Citizen's Guide" to FOIA, under the heading "The Scope of the Freedom of Information Act," it says:

> The Federal Freedom of Information Act applies to documents held by agencies in the executive branch of the Federal Government.

The executive branch includes cabinet departments, military departments, government corporations, government controlled corporations, independent regulatory agencies, and other establishments in the executive branch. "A Citizen's Guide on Using the Freedom of Information Act and the Privacy Act of 1974 to Request Government Records," H.R. Rep. No. 103–104, at 5 (1993).

(where the general term reflects back on the more specific rather than the other way around), [so] that the phrase 'A, B, or any other C' indicates that A is a subset of C." *United States v. Williams–Davis*, 90 F.3d 490, 508–09 (D.C.Cir.1996).[3] In short, then, because the Smithsonian is not an establishment in the executive branch, it cannot fall into any of the conceivably applicable § 552(f) categories.

Plaintiff proposes that we read the word "includes" in § 552(f) as an invitation to extend agency status to entities that do not belong among the types enumerated but have something in common with them. In support of this idea, she points to legislative history indicating that § 552(f) was intended to broaden FOIA's scope so that it would embrace entities "which perform governmental functions and control information of interest to the public." H.R. Rep. No. 876, 93rd Cong., 2d Sess. 8 (1974). But Congress did not back this observation with any statutory text remotely matching its scope, such as "governmental entity," and accordingly we stick to the text as enacted.

■ We recognize, of course, that the word "includes" normally does not introduce an exhaustive list but merely sets out examples of some "general principle." *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 4, 86 L.Ed. 65 (1941). But behind § 552(f)'s enumeration there appears to be no general principle in sight other than the one set out in § 551(1); indeed, plaintiff points to no alternative general principle. Moreover, as we have just said, § 552(f)'s structure indicates that Congress did perceive a unifying theme in the four specific kinds of entity mentioned before the catch-all clause—a theme (belonging to the executive branch) not manifest in the Smithsonian. Accordingly, we now turn to § 551(1).

Plaintiff asserts that the Smithsonian fits § 551(1)'s core phrase, "authority of the Government of the United States." In support of this proposition she marshals an impressive array of links between the Smithsonian and the federal government. To list the main ones: the Smithsonian operates under a federal charter granted by Congress in 1846; most of its employees—some 70% according to plaintiff, Brief for Appellee at 16 n.3—are considered federal civil service employees; its Regents, as mentioned, are federal officials or are selected by federal officials; it receives extensive federal funding and must submit a detailed annual statement of its expenditures to Congress, 20 U.S.C. § 49; its use of public monies is subject to the audit and reporting requirements of the General Accounting Office; "[a]ll moneys recovered by or accruing to [the Smithsonian are] paid into the Treasury of the United States, to the credit of the Smithsonian bequest, and separately accounted for," 20 U.S.C. § 53; it enjoys federal immunity from taxes and libel actions; it receives representation (as in this case) from the Department of Justice; and it publishes rules and notices in the Code of Federal Regulations and the Federal Register. See *Dong*, 878 F.Supp. at 248–49; *Cotton v. Adams*, 798 F.Supp. at 24.

We have already held that factors like these justify classifying the Smithsonian as an "independent establishment of the United States" for purposes of the Federal Tort Claims Act. See *Expeditions Unlimited Aquatic Enterprises, Inc. v. Smithsonian Institution*, 566 F.2d 289, 296 (D.C.Cir.1977) (*en banc*). But the statute in question here uses narrower language; an entity may be deeply entwined with the federal government without being an "authority of the Government of the United States." Ultimately, then, as we said in rejecting a similar claim, plaintiff's litany of links between the Smithsonian and the federal government is "like Homer's catalogue of ships—exhaustive but

---

**3.** Congress's decision to place the so-called independent regulatory agencies *after* the catch-all phrase confirms this interpretation, in view of the uncertain constitutional status of such agencies vis-à-vis the executive branch. Compare *Wiener v. United States*, 357 U.S. 349, 353, 78 S.Ct. 1275, 1278, 2 L.Ed.2d 1377 (1958) (President may freely remove officials who are "part of

the Executive establishment," as opposed to "those whose tasks require absolute freedom from Executive interference") with *Morrison v. Olson*, 487 U.S. 654, 687–92, 108 S.Ct. 2597, 2617–20, 101 L.Ed.2d 569 (1988) (Congress may place some limits on President's discretion to remove officials exercising executive functions).

quite beside the point." *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C.Cir.1993).

The term "authority" is not self-defining. At the very least, however, it seems logical that for an entity to *be* an authority of the government it must *exercise* some governmental authority. Scholars of the APA appear to agree. As one commentator put it, an "agency" for APA purposes is

> a part of government which is generally independent in the exercise of [its] functions and which by law has authority to take final and binding action affecting the rights and obligations of individuals, particularly by the characteristic procedures of rule-making and adjudication.

James O. Freedman, "Administrative Procedure and the Control of Foreign Direct Investment," 119 U. Pa. L.Rev. 1, 9 (1970) (internal quotations omitted) (cited in *Irwin Memorial Blood Bank v. American National Red Cross*, 640 F.2d 1051, 1053 (9th Cir. 1981)). See also 1 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 1.2, at 4 (3d ed.1994) (focusing on whether "the entity has, or lacks, authority to take binding action"); *Washington Research Project, Inc. v. Dep't of Health, Education and Welfare*, 504 F.2d 238, 248 & n. 15 (D.C.Cir.1974) (citing legislative history of APA in support of a requirement of "final and binding action"); *J.H. Miles & Co., Inc. v. Brown*, 910 F.Supp. 1138, 1159 (E.D.Va. 1995) (holding that quasi-government fisheries council "is not an 'authority' of the U.S. Government because it has no 'authority' to do anything").

Our cases have followed the same approach, requiring that an entity exercise substantial independent authority before it can be considered an agency for § 551(1) purposes. It is quite true that, apart from its roots in the language of § 551(1) and its legislative history, our "substantial independent authority" test both originated in a case involving an entity in the Executive Office of the President, *Soucie v. David*, 448 F.2d 1067 (D.C.Cir.1971) (Office of Science and Technology), and has most often been applied in the case of such entities, see *Armstrong v. Executive Office of the President*, 90 F.3d 553 (D.C.Cir.1996) (National Security Coun-

cil); *Meyer*, 981 F.2d at 1291–98 (Task Force on Regulatory Reform); *Rushforth v. Council of Economic Advisers*, 762 F.2d 1038, 1040–43 (D.C.Cir.1985) (Council of Economic Advisers); *Pacific Legal Foundation v. Council on Environmental Quality*, 636 F.2d 1259, 1263 (D.C.Cir.1980) (Council on Environmental Quality); cf. *Sweetland v. Walters*, 60 F.3d 852 (D.C.Cir.1995) (Executive Residence of the President, deemed "analogous" to a unit of the Executive Office of the President). In such cases, naturally, much of the focus was on the *independence* aspect of the formula, since obviously the President exercises authority, and those who have his ear must at a minimum possess some degree of derivative authority. But the requirement of *authority* derives both from the statutory language itself and from legislative history characterizing the requisite type of authority ("final and binding," see H.R. Rep. No. 1980, 79th Cong., 2d Sess., at 19 (1946), cited in *Washington Research Project*, 504 F.2d at 248–49 n. 15), and we have applied the requirement in at least two cases not involving presidential power at all. In *Energy Research Foundation* we applied it to the Defense Nuclear Facilities Safety Board, 917 F.2d at 584–85 (finding it covered because of its investigative and evaluative powers), and in *Washington Research Project* we held that "initial research groups," scholars appointed by the National Institute of Mental Health primarily from outside NIMH to conduct peer review of grant applications, were not agencies under the FOIA definition precisely because of their lack of authority even to make government grants, 504 F.2d at 248.

*Washington Research Project* might be read to imply that the "initial research groups," had they in fact possessed the power to decide how federal grant money was spent, would have been considered agencies for FOIA purposes. But we have already warned against such a reading of that case. "We held [in *Washington Research Project*] that because the organization in question had no authority to make decisions it was not a government agency, but the converse of that proposition may not always be true; that an organization makes decisions does not always mean that it is a government agency." *Pub-*

*lic Citizen Health Research Group v. Dep't of Health, Education and Welfare,* 668 F.2d 537, 543 (D.C.Cir.1981). In addition, in *Washington Research Project* we noted that the body that *was* empowered to determine the allocation of the grants in question, the National Advisory Mental Health Council ("NAMHC"), derived this power directly from a statute which "empower[ed] the Secretary [of Health, Education & Welfare] to make grant awards if (and only if) the NAMHC so recommends." *Id.* at 248. Plaintiff has identified no comparable delegation of authority to the Smithsonian to control the allocation of federal research dollars, and we know of none. To the extent that the Smithsonian devotes part of its own budget to funding grants and fellowships, it appears to be no different from any private research university which receives federal funds and enjoys some control over their use.

The Smithsonian is a cultural and research institution, established in 1846 pursuant to a trust bequest of James Smithson, and dedicated to "the increase and diffusion of knowledge among men." 20 U.S.C. § 41. It does not make binding rules of general application or determine rights and duties through adjudication. It issues no orders and performs no regulatory functions. Plaintiff's efforts to demonstrate that the Smithsonian exercises authority focus mainly on Congress's delegation to the institution of limited police powers, including arrest powers, on its own grounds. See 40 U.S.C. §§ 193n, 193v, 193t. She also notes that Congress has authorized the Smithsonian to promulgate regulations in support of its power to maintain safety and order on its premises. 40 U.S.C. § 193r; see 36 C.F.R. §§ 504–20. Yet these limited powers, which enable the Smithsonian to protect its own collections and facilities, fall far short of converting the Smithsonian into "an authority of the Government of the United States." As we said recently, "the Smithsonian's ability to hire its own police force carries little probative weight in that many private museums employ their own security

personnel." *Cotton v. Heyman,* 63 F.3d 1115, 1122 (D.C.Cir.1995).

Our cases, as noted, speak of "*substantial* independent authority." They do not support the proposition that the exercise of *any* independent authority, however confined, converts an entity into an "authority of the Government of the United States." For example, we affirmed a district court decision that the National Academy of Sciences ("NAS") was not an "agency" under § 551(1) despite the fact that it possessed the apparent authority—greater than any possessed by the Smithsonian—to veto the Environmental Protection Agency's suspension of auto emission standards. *Lombardo v. Handler,* 397 F.Supp. 792, 794 (D.D.C.1975), *aff'd,* 546 F.2d 1043 (D.C.Cir.1976). Like the NAS, the Smithsonian simply is not the kind of "center of gravity in the exercise of administrative power" to which § 551(1) refers. *Lombardo,* 397 F.Supp. at 796 (citing Freedman, 119 U. Pa. L.Rev. at 9).

■ In the most literal sense, of course, the Smithsonian's broad, Congressionally-granted latitude over spending its federally allocated funds and over its own personnel and collections indicates that it possesses "authority in law to make decisions." *Cotton v. Heyman,* 63 F.3d at 1122 (citing *Washington Research Project,* 504 F.2d at 248). But every private organization possesses the power to order its own affairs and carry out transactions with others within the limits set by law. To the extent the Smithsonian exercises anything approaching public authority, that authority appears to be entirely ancillary to its cultural and educational mission.[4] Authority must be governmental in nature to count for § 551(1) purposes.

Finally, plaintiff points out that the Smithsonian is treated as an agency under other federal statutes. Indeed, in acknowledging plaintiff's extensive enumeration of governmental ties we cited the finding of *Expeditions Unlimited,* 566 F.2d at 296, that the Federal Tort Claims Act embraced the Smithsonian, but pointed out that the FTCA

---

4. In addition to the "on-campus" police powers mentioned above, Congress has delegated to the Smithsonian control over certain cultural and research facilities such as the National Zoo, see

20 U.S.C. § 81, and the Canal Zone Biological Area, a 4000–acre tropical forest on Barro Colorado Island, see 20 U.S.C. § 79b.

defined "Federal agency" broadly to include "independent establishments of the United States." 28 U.S.C. § 2671. Unsurprisingly, the Smithsonian is subject to other statutes whose language also differs from that of the Privacy Act. Thus, Smithsonian employees are covered by the Federal Employment Compensation Act, which applies to employees of "instrumentalit[ies] wholly owned by the United States," 5 U.S.C. § 8101(1)(A), which the Smithsonian concedes it is, at least insofar as the United States, as trustee, holds legal title to the original Smithson trust property and later accretions. Similarly, it is subject to the Inspector General Act ("IGA") not by virtue of any agency status, but because Congress has declared it a "designated Federal entity" for IGA purposes, 5 U.S.C.App. 3, § 8G(a)(2). The Smithsonian's status under these other statutes is therefore inapposite.

In sum, the Smithsonian lacks both the "authority" necessary for it to qualify as an "authority of the government of the United States" under § 551(1) and the executive department status necessary under § 552(f).

The judgment of the district court is therefore

*Reversed.*