Opinion issued August 31, 2005








     






In The
Court of Appeals
For The
First District of Texas




NO. 01–03–01340–CV




SMI REALTY MANAGEMENT CORPORATION, Appellant

V.

UNDERWRITERS AT LLOYD’S, LONDON, Appellee




On Appeal from the 281st District Court 
Harris County, Texas
Trial Court Cause No. 2002–62333




O P I N I O N 

          In this insurance-coverage dispute, SMI Realty Management Corporation
(“SMI”) appeals the trial court’s summary judgment in favor of Underwriters at
Lloyd’s, London (“Underwriters”). We determine whether the term “Leakage,” found
in an exclusionary provision of an “all-risks” policy, is ambiguous or whether, as a
matter of law, it serves to deny SMI coverage in this case.
          We reverse and remand.
Factual and Procedural Background
          SMI contracted with Underwriters for first-party property insurance, covering
the period of January 9, 1999 to January 9, 2000. The “all-risks” policy provided
coverage for the Rutledge Apartments, an apartment complex managed by SMI. In
September 1999, SMI discovered foundation damage at the complex. SMI filed a
property loss notice with Underwriters’s agent, attributing the foundation damage to
“a plumbing leak underground.” 
          Underwriters ultimately refused to pay the claim under the policy. SMI filed
suit on December 9, 2002, alleging that “the foundation damage to the apartments
was caused by a sewer pipe leak, which is covered under the [policy].” SMI based
its claims against Underwriters on violations of Texas Insurance Code articles 21.21
and 21.55, breach of Underwriters’s duty of good faith and fair dealing, and breach
of contract. 
          During the discovery process, SMI produced a copy of a report to
Underwriters, prepared by David Grissom, a licensed professional engineer. The
March 6, 2001 report stated that Grissom had inspected and surveyed the subject
apartment building that was experiencing foundation damage. In his report, Grissom
noted that the building was built in 1963 and has a “cast iron sewage system.” He
explained that “[t]he corrosive nature of the clay soil in the area has been known the
[sic] deteriorate cast iron pipe to the point of leaking in less than 20 years.” With
regard to the subject building, he advised as follows:
The whole system appears to be leaking due to age and deterioration and
very likely needs to be completely replaced. You would be ill advised
to just replace the sewer system on the areas of the known leaks. All the
case iron sewer should be replaced. The foundation motion now evident
is what one would expect if the sewer has been discharging water under
the slab for almost 20 years.
Grissom concluded, “It is my opinion that sewer leaks are responsible for the repairs
now needed on this foundation.” In a supplemental report dated May 31, 2002,
Grissom reiterated that, in his professional opinion, the sewer lines at the apartment
complex were leaking due to deterioration and age. He opined that “[i]t is clear that
leaks in the badly corroded sewer system have caused the foundation motion” and
“[i]t seems clear that sewer leaks are responsible for the repairs now needed on this
foundation.” 
          Underwriters filed a motion for summary judgment, contending that SMI’s
claim was not covered because the policy expressly excludes loss or damage caused,
directly or indirectly, by deterioration, corrosion, or leakage. In addition to the policy
and SMI’s notice of property loss, Underwriters offered Grissom’s report and
supplemental report as summary judgment evidence. Referring to Grissom as
“plaintiff’s expert,” Underwriters pointed out that Grissom’s reports, taken as true,
showed that the claimed loss was caused by deterioration, corrosion, and leakage;
thus, the claim was properly excluded and Underwriters was entitled to judgment as
a matter of law. 
          In its response, SMI contended that the exclusion relied on by Underwriters,
and in particular the term “Leakage,” found in the exclusion, is ambiguous. SMI
asserted that the exclusion could be reasonably read to exclude only losses that occur
gradually, over time. SMI reasoned, “Thus, it is reasonable to assume that Lloyds did
not intend to exclude damages that occurred in a relatively short period of time, but
rather only damages that occurred gradually.” 
          SMI contended that Grissom’s reports were not competent summary judgment
evidence because Grissom was not SMI’s “designated” expert.


 SMI offered the
report of Ralph Adams, a professional engineer, who SMI had expressly designated
as its expert. In his report, Adams disagreed with Grissom’s opinion regarding the
cause of the sewer line leaks. Although he stated that the cause of the sewer pipe
leaks was not known, Adams doubted that the leakage was caused by corrosion, as
concluded by Grissom. Adams opined that the damage to the foundation occurred as
a result of a broken sewer line “in a relatively short period of time.” Based on
Adams’s opinion and its reading of the exclusion, SMI asserted that a genuine issue
of material fact existed as to whether SMI’s loss fell within the exclusion cited by
Underwriters.
          Underwriters filed a reply in which it contended, inter alia, that the term
“Leakage” found in the applicable exclusion was not ambiguous. Following a
hearing, the trial court signed an order granting Underwriters’s motion for summary
judgment and ordered that SMI take nothing by its claims against Underwriters. 
Standard of Review
          The well-settled principles governing the review of summary judgments apply
in insurance coverage cases. Hanson v. Republic Ins. Co., 5 S.W.3d 324, 327 (Tex.
App.—Houston [1st Dist.] 1999, pet. denied). That is, the issue on appeal is whether
the movant met its summary judgment burden by establishing that no genuine issue
of material fact exists and that the movant is entitled to judgment as a matter of law. 
Tex. R. Civ. P. 166a(c); S.W. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex.
2002). Once the defendant produces sufficient evidence to establish the right to
summary judgment, the burden shifts to the plaintiff to come forward with competent
controverting evidence raising a genuine issue of material fact with regard to the
element challenged by the defendant. Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195,
197 (Tex. 1995). When an order granting summary judgment does not specify the
grounds on which it was granted, as here, we will affirm the judgment if any of the
movant’s theories are supported by the evidence. Carr v. Brasher, 776 S.W.2d 567,
569 (Tex. 1989).
The Policy Provisions and Contentions of the Parties
          In this “all-risks” policy, the relevant provisions are as follows:
5.PERILS INSURED AGAINST
This Certificate insures against All Risks of Direct Physical Loss 
or Damage to covered property occurring during the period of this
Certificate.
 
6.PERILS EXCLUDED
 
This Certificate does not insure against loss or damage caused
directly or indirectly by any of the following, whether the loss or
damage was caused in whole or in part by the excluded peril and
whether any other peril contributed to such loss or damage.
 
1.Wear, tear or gradual deterioration; Wet rot, dry rot
or mould; Spoilage, decay or decomposition;
Normal settling, shrinking or expansion in
buildings; [sic] structures or foundations; Corrosion
or rust; Erosion; Leakage; any other gradually
occurring loss; or any loss which commenced prior
to the inception of this Certificate. 
(Emphasis added.)
          Underwriters contends that SMI’s claimed loss is not covered under the policy
based on the above exclusion, under either Grissom’s or Adams’s report. Both
experts opined that the foundation damage was caused by a sewer leak. The experts’
opinions can be characterized as differing in that Grissom believed that the damage
was caused by sewer leaks that were gradual, occurring over a long period of time,
while Adams believed that the sewer leaks were caused by broken pipes, occurring
over a short period of time. 
          “Leakage” is not defined in the policy and each party offers its own definition.
Underwriters reads the exclusionary term to mean any type of leakage, regardless of
whether it occurred rapidly or gradually. SMI counters that the term can be
reasonably read to exclude only gradually occurring leaks. 
          SMI relies on the doctrine of contra proferentem, or construing a contract term
against the insurer in favor of coverage. This doctrine, however, is employed only
when construing an ambiguous policy provision. Evergreen Nat’l Indem. Co. v. Tan
It All, Inc., 111 S.W.3d 669, 676–77 (Tex. App.—Austin 2003, no. pet.); see also
State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 433 (Tex. 1995) (explaining
that only if insurance policy remains ambiguous after courts apply canons of
interpretation should policy’s language be construed against insurer in manner that
favors coverage). Thus, if the policy is subject to more than one reasonable
interpretation, we must adopt the construction most favorable to the insured when we
resolve the uncertainty. State Farm Fire & Cas. Co. v. Vaughan, 968 S.W.2d 931,
933 (Tex. 1998). An ambiguity does not arise with respect to a policy merely because
the parties advance conflicting interpretations. Grain Dealers Mut. Ins. Co. v.
McKee, 943 S.W.2d 455, 458 (Tex. 1997). Whether a policy provision is ambiguous
is a question of law for the court to decide. Kelley-Coppedge, Inc. v. Highlands Ins.
Co., 980 S.W.2d 462, 464 (Tex. 1998). 
          In making this determination, we interpret insurance policies according to the
rules of contract construction. Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154,
157 (Tex. 2003). Our primary goal, therefore, is to give effect to the written
expression of the parties’ intent. Beaston, 907 S.W.2d at 433. To this end, we
construe the terms of the contract as a whole and consider all of its terms, not in
isolation, but within the context of the contract. Id.; Forbau v. Aetna Life Ins. Co.,
876 S.W.2d 132, 133–34 (Tex. 1994); Hartrick v. Great Am. Lloyds Ins. Co., 62
S.W.3d 270, 274 (Tex. App.—Houston [1st Dist.] 2001, no pet.).
          If a contract can be given only one reasonable meaning, it is not ambiguous and
will be enforced as written. See Kelley-Coppedge, 980 S.W.2d at 464. On the other
hand, if a contract is susceptible to two or more reasonable interpretations, it is
ambiguous. Id. When an alleged contract ambiguity involves an exclusionary
provision of an insurance policy, then we “‘must adopt the construction . . . urged by
the insured as long as that construction is not unreasonable, even if the construction
urged by the insurer appears to be more reasonable or a more accurate reflection of
the parties’ intent.’” Balandran v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex.
1998) (quoting Nat’l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,
811 S.W.2d 552, 555 (Tex. 1991)). The insurer has the burden of proving that a
policy limitation or exclusion constitutes an avoidance or an affirmative defense. 
Utica Nat’l Ins. Co. of Tex. v. Am. Indem. Co., 141 S.W.3d 198, 204 (Tex. 2004). 
With these principles in mind, we turn to the crucial question in this case: Is SMI’s
interpretation of the term “Leakage” in the exclusion reasonable?
          The parties have not directed us to any cases interpreting this precise
exclusionary provision and our own research has found none. SMI asserts that the
last phrase of the exclusion, “any other gradually occurring loss,” indicates that only
gradually occurring leaks are excluded from coverage. According to SMI, the use of
the word “other” signals that the contracting parties (SMI and Underwriters) viewed
the perils listed before that phrase, including “Leakage,” to also be gradually
occurring losses. SMI contends that, at a minimum, the phrase refers to the
immediately preceding term listed in the exclusion: “Leakage.” 
          In essence, SMI is offering the reverse of the interpretive canon of ejusdem
generis. The rule of ejusdem generis provides that, when words of a general nature
are used in connection with the designation of particular objects or classes of persons
or things, the meaning of the general words will be restricted to the particular
designation. Hilco Elec. Coop., Inc. v. Midlothian Butane Gas Co., 111 S.W.3d 75,
81 (Tex. 2003). The “reverse ejusdem generis” principle has been applied by courts
to allow a broader category to define the scope of a more specific example. See Dong
v. Smithsonian Inst., 125 F.3d 877, 879–80 (D.C. Cir. 2000) (applying reverse
ejusdem generis to conclude that, when federal statute, 42 U.S.C. section 552(f),
defines agency as “any executive department, military department, Government
corporation, Government controlled corporation, or other establishment in the
executive branch,” first four, specific classes are limited to “establishments in the
executive branch”); Bristol-Myers Squibb Co. v. United States, 48 Fed. Cl. 350, 358
(2000) (applying reverse ejusdem generis to construe contractual provision). The
courts have reasoned that “‘the phrase ‘A, B, or any other C’ indicates that A is a
subset of C.’” Dong, 125 F.3d at 880 (quoting United States v. Williams-Davis, 90
F.3d 490, 508–09 (D.C. Cir. 1996)); see also Cochran, Fox & Co., Inc. v. Public Serv.
Comm’n, No. 98–1765, 1999 WL 624395, at *3 (Wis. Ct. App. Aug. 18, 1999)
(concluding that, when statute defines “transmission equipment and property” as “any
conduit, subway, pole, tower, transmission wire or other equipment on, over or under
any street or highway,” the phrase “on, over or under any street or highway” further
restricts meaning of specific terms to types of structural transmission equipment along
or under public rights of way); United States v. Delgado, 4 F.3d 780, 786 (9th Cir.
1992) (providing example that “a statute regulating fishing may state that licensed
individuals may catch . . . ‘bass, trout, or any other fresh water fish.’ The limits
would apply to fresh water bass, such as black bass, but not to sea bass, because the
clause ‘or any other fresh water fish’ limits ‘bass’ and ‘trout’ to those in fresh
water.”).


 Similarly, SMI contends that the policy excludes only gradually occurring
leakage, but not sudden leakage, because the phrase “any other gradually occurring
loss” limits the scope of “Leakage” to that which is gradually occurring. That is,
“Leakage” is modified by, and a subset of, “any other gradually occurring loss.” We
conclude that such a reading of the term “Leakage” is reasonable. 
          Not surprisingly, Underwriters disagrees that the phrase “any other gradually
occurring loss” serves to limit the meaning of “Leakage.” It contends that all leakage,
and not only gradually occurring leakage, is excluded from coverage because the term
“Leakage” and the phrase “any other gradually occurring loss” are separated by a
semicolon. In its brief, Underwriters avers, “[T]he semi-colon establishes that the
two phrases have independent significance, and denotes that they do not depend on
each other for meaning but instead should be read independently.” Underwriters
asserts that “Leakage” is “an independent phrase not modified by those that precede
or follow it.” Underwriters further contends that “[t]he fact that ‘Leakage’ is
capitalized only adds to this conclusion.” As highlighted by the dissenting opinion,
Underwriters’s reading of the exclusion is one reasonable interpretation. However,
it is not the only reasonable interpretation and does not serve to make SMI’s reading
of the disputed language unreasonable. See Balandran, 972 S.W.2d at 741. 
          To support its position that its reading of the exclusion is definitive,
Underwriters cites Criswell v. European Crossroads Shopping Center, Ltd., 792
S.W.2d 945 (Tex. 1990). In that case, the Texas Supreme Court noted that, although
words contained in an instrument should be used as controlling guides, punctuation
marks can aid in the construction of a document. Id. at 948. In interpreting a
contractual provision, the court determined the effect of a semicolon that separated
two phrases in the contract. Id. Based on the specific facts of that case, the Criswell
court concluded that the use of semicolons by the drafter “indicated that each phrase
set off by a semicolon was to be read as having independent significance.” Id. 
          Here, each peril listed in the exclusion also has “independent significance”;
that is, a loss caused by any one of the enumerated perils is excluded. As in Criswell,
the semicolons in the exclusion appear to denote the word “or.” Id. However, unlike
those in Criswell, the phrases at issue here are not completely self-referential. Rather,
the final phrase of the exclusion—“any other gradually occurring loss”—can be
reasonably construed to both lend meaning to, and derive meaning from, the terms
that precede it. Moreover, SMI is not seeking to rely on one clause to effectively
nullify another; instead, SMI promotes a reading that harmonizes the terms of the
exclusion. 
          Underwriters also contends that to accept SMI’s interpretation of “Leakage”
would be to read the term out of the contract and render it superfluous. Underwriters
asserts, “To accept SMI’s argument and construe the exclusion for ‘Leakage’ to mean
only damage caused by leakage ‘occurring gradually’ would be superfluous, because
the loss would be excluded simply by the phrase ‘any other gradually occurring
loss.’” We disagree with Underwriters’s reasoning. 
          The relevant phrases of the policy exclusion can be read to avoid superfluities. 
The exclusion lists numerous, specific perils that are excluded, including “Leakage.” 
The exclusion also contains the catch-all phrase “any other gradually occurring loss,”
which strives to exclude from coverage any gradually occurring losses not previously
encompassed within the exclusion. In other words, the “any other gradually
occurring loss” phrase can be reasonably read to indicate that the terms preceding it
in the paragraph are not exhaustive. Construed in this manner, neither “Leakage” nor
“any other gradually occurring loss” is rendered superfluous. That the latter catch-all
phrase can also be read to limit the scope of “Leakage” does not render “Leakage”
useless as an exclusionary term. 
          Underwriters also contends that the “specific ‘Leakage’ provision” governs
over the “more general ‘any other gradually occurring loss’ provision.” In this
regard, Underwriters relies on the well-established maxim that when there is a
conflict between two contract provisions, the specific provision controls over the
general provision. See C.M. Asfahl Agency v. Tensor, Inc., 135 S.W.3d 768, 782
(Tex. App.—Houston [1st Dist.] 2004, no pet.); Ostrowski v. Ivanhoe Prop. Owners
Improvement Ass’n, Inc., 38 S.W.3d 248, 254 (Tex. App.—Texarkana 2001, pet.
denied). However, no “conflict” exists between the term “Leakage” and the phrase
“any other gradually occurring loss.” Rather, the provisions are harmonized under
SMI’s reading of the provision. “Any other gradually occurring loss” serves to
further define “Leakage” and also operates as a catch-all phrase to exclude additional,
gradually occurring losses not specifically contemplated in the exclusion. 
          Moreover, this is not a matter of whether a general term controls over a specific
one; rather, it is a matter of whether, when read contextually, one phrase can
reasonably be read as qualifying or limiting another. It is also noteworthy that
Underwriters’s reading arguably renders “Leakage” the more general term. 
Underwriters interprets “Leakage” to denote all types of leaks, while SMI views “any
other gradually occurring loss” as limiting the types of perils excluded to those that
are gradually occurring. In any event, we conclude that the phraseology at issue does
not fit the “specific controls the general” rubric of contract interpretation. 
          Underwriters further points out that the first portion of the exclusion provides
that damage caused by “Wear, tear or gradual deterioration” are not covered. 
(Emphasis added.) Underwriters contends that, because it chose to modify the term
“deterioration” with the word “gradual,” the lack of such modification before the term
“Leakage” shows a clear intent not to limit leakage to leaks that are gradually
occurring. It is noteworthy that “gradual deterioration” is among the first perils listed
in the exclusion, while “Leakage” is the last, juxtaposed directly next to the phrase
“any other gradually occurring loss.” Underwriters’s contention would find more
support if “gradual deterioration” had been placed toward the end of the exclusion,
near the phrase “any other gradually occurring loss.” 
          In sum, though Underwriters interpretation of the term “Leakage” is
reasonable, it does not render SMI’s reading unreasonable. To the contrary, we
conclude that SMI’s reading that “Leakage” is limited to gradually occurring leakage
is not an unreasonable interpretation in light of the word choice and syntax utilized
by Underwriters in drafting the exclusionary provision.


 Thus, the exclusionary
provision in the policy, in particular the term “Leakage,” is ambiguous. See
Balandran, 972 S.W.2d at 741. Because SMI is the insured, we must adopt their
interpretation as the proper construction of the policy. See id. at 742. By offering the
expert opinion of Adams that the damage to the foundation had occurred as a result
of a broken sewer line “in a relatively short period of time,” SMI created a genuine
issue of material fact regarding coverage.


 We hold that the trial court did not
properly grant summary judgment in this case.
          We sustain SMI’s sole issue.
Conclusion
          We reverse the judgment of the trial court and remand the cause for further
proceedings.





                                                                        Laura Carter Higley
                                                                        Justice

Panel consists of Chief Justice Radack and Justices Hanks and Higley.

Chief Justice Radack dissenting.