# Office of Government Ethics Jurisdiction Over the Smithsonian Institution

The authority of the Office of Government Ethics to administer the Executive Branch ethics program under the Ethics in Government Act of 1978 and other statutes does not extend to the Smithsonian Institution or its personnel.

February 29, 2008

MEMORANDUM OPINION FOR THE DIRECTOR
OFFICE OF GOVERNMENT ETHICS

The Ethics in Government Act of 1978 ("EIGA"), Pub. L. No. 95-521, 92 Stat. 1824 (codified as amended at 5 U.S.C. app., EIGA §§ 101–111, 401–408, 501–505 (2000 & Supp. V 2005)), established the Office of Government Ethics ("OGE") and charged it with developing and implementing ethics policies for the Executive Branch. You have asked whether the Smithsonian Institution and its personnel (the "Smithsonian" or "Institution") are subject to OGE's authority to administer the Executive Branch ethics program.[1] We conclude that they are not.

## I.

With limited exceptions not applicable here, OGE's jurisdiction does not extend to an entity outside the Executive Branch. The text and structure of EIGA unmistakably support this conclusion.

EIGA clearly indicates that the Executive Branch is the focus of OGE's jurisdiction. EIGA establishes a tripartite structure for the federal government's ethics program that tracks the Constitution's three-branch structure. Title I of EIGA, which governs financial disclosure requirements for federal officials and employees, creates a separate "supervising ethics office" for each of the three branches. It specifies that OGE is the "supervising ethics office . . . for all executive branch officers and employees," 5 U.S.C. app., EIGA § 109(18), and authorizes its Director (along with certain agency officials) to administer financial disclosure requirements for Executive Branch officials and employees, *id.* § 111(1). EIGA provides that the ethics committees in the Senate and House of Representatives perform those functions for members of Congress, "officers and employees" of the two houses, and "employees of the legislative branch," *id.* § 109(18)(A), (B); *id.* § 111(2); and the Judicial Conference does so "for judicial officers and judicial

---

[1] *See* Letter for Steven G. Bradbury, Acting Assistant Attorney General, Office of Legal Counsel, from Robert I. Cusick, Director, Office of Government Ethics (Apr. 26, 2007) ("OGE Letter"). We also have received the views of the Smithsonian Institution. *See* Letter for John P. Elwood, Deputy Assistant Attorney General, Office of Legal Counsel, from John E. Huerta, General Counsel, Smithsonian Institution (May 11, 2007) ("Smithsonian Letter").

employees," *id.* § 109(18)(C); *id.* § 111(3). Title V of EIGA, which imposes restrictions on outside sources of income or employment by high-level federal employees, distributes administrative and regulatory authority in the same manner; OGE is directed to issue rules and regulations to implement its provisions "with respect to officers and employees of the executive branch." *Id.* § 503(2).

EIGA directs OGE to develop and implement ethics policies for the Executive Branch. Title IV of EIGA, which constitutes OGE's "organic law," OGE Letter at 2, authorizes OGE's Director to "provide . . . overall direction of executive branch policies related to preventing conflicts of interest on the part of officers and employees of any executive agency." *Id.* § 402(a). The Director's duties include, among other things, developing rules and regulations to address conflicts of interest and ethics in the Executive Branch, *id.* § 402(b)(1)–(2), monitoring Executive Branch compliance with financial disclosure and reporting requirements, *id.* § 402(b)(3)–(5), and ensuring that executive agencies develop and implement appropriate ethics rules, *id.* § 402(c)–(f).

Other authorities also direct OGE to oversee Executive Branch ethics programs. Sections 7351 and 7353 of title 5 of the United States Code authorize OGE to implement statutory restrictions on gifts to federal employees and gifts from federal employees to their superiors by issuing regulations "for all executive branch officers and employees." 5 U.S.C. §§ 7351(c), 7353(b), (d) (2000 & Supp. V 2005). And the President has delegated OGE authority under 5 U.S.C. § 7301 (2000) to "prescribe regulations for the conduct of employees in the executive branch." Exec. Order No. 12731, § 403, 3 C.F.R. 306, 310 (1990 Comp.). Thus, the authorities that created OGE and articulate its jurisdiction and responsibilities make clear that, with limited exceptions not implicated here, OGE supervises only entities and employees in the "executive branch."[2]

> The term "executive branch" is defined for purposes of title I of EIGA as follows:

> For the purposes of this title, the term . . . "executive branch" includes each Executive agency (as defined in section 105 of title 5, United States Code), other than the Government Accountability Office, and any other entity or administrative unit in the executive branch . . . .

---

[2] Under 18 U.S.C. § 208(b)(2) and (d)(2) (2000), OGE is authorized to issue regulations exempting employees from a criminal conflict of interest statute that applies to "an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee." *Id.* § 208(a). You have not asked us to consider any issues regarding the application of section 208 to the Smithsonian or the extent of OGE's authority under that provision. *See* OGE Letter at 2 n.1.

5 U.S.C. app., EIGA § 109. OGE has adopted a similar definition in its regulations implementing title IV:

> *Executive branch* includes each executive agency as defined in 5 U.S.C. 105 and any other entity or administrative unit in the executive branch. However, it does not include any agency, entity, office or commission that is defined by or referred to in 5 U.S.C. app. 109(8)–(11) of the Act as within the judicial or legislative branch.

5 C.F.R. § 2638.104 (2006); *see also* 5 U.S.C. app., EIGA § 109(8)–(11) (defining the terms "judicial employee," "Judicial Conference," "judicial officer," and "legislative branch"). We see no reason to believe that Congress intended that the term would have another meaning under the other authorities providing OGE with jurisdiction over "executive branch" officers and employees. *See Enfield ex rel. Enfield v. A.B. Chance Co.*, 228 F.3d 1245, 1251 (10th Cir. 2000) ("It is a well recognized rule of statutory construction used to determine legislative intent that ordinarily identical words or terms used in different statutes on a specific subject are interpreted to have the same meaning in the absence of anything in the context to indicate that a different meaning was intended.") (quotation marks omitted).

The definition of "executive branch" set forth in title I provides that the term "includes each Executive agency as defined in 5 U.S.C. 105." Section 105's definition is also referenced in title IV of the Act. *See* 5 U.S.C. app., EIGA § 402(a) (stating that the Director shall provide "overall direction of executive branch policies" related to preventing conflicts of interest on the part of "officers and employees of any executive agency, as defined in section 105 of title 5, United States Code"); *cf.* Exec. Order No. 12731, § 503(c), 3 C.F.R. at 310 ("'Agency' means any executive agency as defined in 5 U.S.C. 105 . . . .").[3] The clear focus of section 105 is on Executive Branch entities: "an Executive department, a Government corporation, and an independent establishment." 5 U.S.C. § 105 (2000). All "Executive department[s]" are within the Executive Branch. *See* 5 U.S.C. § 101 (2006); *see also Haddon v. Walters*, 43 F.3d 1488, 1490 (D.C. Cir. 1995) (referencing the "exclusive list of Executive departments" in 5 U.S.C. § 101). Similarly, the term "independent establishment" is defined as "(1) an establishment in the executive branch," and "(2) the Government Accountability Office." 5 U.S.C. § 104 (2006). The definitions in both title I of EIGA and the regulations implementing title IV, however, explicitly exclude from their reach the Government Accountability Office, which is a Legislative Branch agency, *see Bowsher v. Synar*, 478 U.S. 714, 730–32 (1986). While the definition of "Government

---

[3] The term "Executive agency" itself plainly suggests agencies within the Executive Branch. Although the term does encompass at least one agency in the Legislative Branch—the Government Accountability Office—it does so only by virtue of an explicit statutory provision, 5 U.S.C. § 104(2) (Supp. V 2005), that tends to underscore that GAO would not otherwise come within the scope of the term.

corporation" in 5 U.S.C. § 103 (2000) is not necessarily limited to Executive Branch entities, this Office has opined that the Smithsonian is not a "Government corporation" for purposes of a similar definition of "agency" under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(f)(1) (2000). Memorandum for Peter Powers, General Counsel, Smithsonian Institution, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Coverage of the Smithsonian Institution by Certain Federal Statutes* at 10 (Feb. 19, 1976) ("Ulman Memorandum"); *see also Status of National Veterans Business Development Corporation*, 28 Op. O.L.C. 70, 73 n.4 (2004) (explaining that "the understanding of ["Government corporation" and "Government controlled corporation"] reflected in the FOIA cases is . . . relevant" to the definition of those terms in 5 U.S.C. § 103); *Rivera v. Heyman*, 982 F. Supp. 932, 938 (S.D.N.Y. 1997) (holding that the Smithsonian is not a government corporation for purposes of 5 U.S.C. § 103), *rev'd in part on other grounds*, 157 F.3d 101 (2d Cir. 1998); *cf. Dong v. Smithsonian Inst.*, 125 F.3d 877, 879 (D.C. Cir. 1997) (stating that there is "much force" to the Smithsonian's claim that it is not a "Government controlled corporation" but finding it unnecessary to resolve the issue).

Moreover, the phrase "executive agency as defined in 5 U.S.C. 105" in section 109 is followed by the catch-all phrase "*any other* entity or administrative unit in the executive branch," confirming that Congress understood the term "Executive agency" to be within that category. The D.C. Circuit applied this principle, which it termed "reverse ejusdem generis," in a similar context. Construing the definition of "agency" within the Privacy Act, 5 U.S.C. § 552a (2000 & Supp. V 2005)— "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government," *id.* § 552(f)(1) (2000)—the court held that the phrase applied only to establishments in the Executive Branch. *Dong*, 125 F.3d at 879–80. The court reasoned, "Congress evidently viewed the four specified classes as examples of 'establishments in the executive branch,' so that an entity clearly outside the executive branch would not qualify even if it could otherwise be shoehorned into the concept of a 'Government controlled corporation.'" *Id.* at 879. This Office found that argument compelling in construing the same definition in the Ulman Memorandum, where we stated that the argument "lend[s] considerable credence to the contention that an authority must be within the Executive branch in order to be covered by" the Privacy Act. *Id.* at 4–5.

We therefore conclude that, with limited exceptions not applicable here, OGE's jurisdiction does not extend to an entity outside the Executive Branch, regardless of whether that entity otherwise meets the definition of "executive agency" found in 5 U.S.C. § 105.

## II.

The question thus becomes whether the Smithsonian is within the Executive Branch of the government for purposes of EIGA. We conclude that it is not.

This Office previously has described the Smithsonian Institution as a "very unusual entity," a "historical and legal anomaly," Memorandum for the Attorney General, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: S. 653, a [sic] Act to Establish a Foundation for the Advancement of Military Medicine* at 1 (May 23, 1983); that occupies an "anomalous position in the Government," Memorandum for Drew S. Days, III, Assistant Attorney General, Civil Rights Division, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel at 2 (Mar. 20, 1978) ("*Status of GPO and Smithsonian*"); "*sui generis*," *Garnishment of Remuneration Paid to Federal Employees*, 3 Op. O.L.C. 274, 277 (1979); and "unique unto its own terms," Ulman Memorandum at 9; *accord* Memorandum for Fred F. Fielding, Counsel to the President, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: President's Removal Power over Certain Appointees* at 8 (Aug. 8, 1983) ("*President's Removal Power*"). On occasion, we have suggested that the Smithsonian is a "congressional agenc[y]" that operates "in aid of the legislative process." *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 172 (1996) (stating that the Smithsonian "fit[s] under a broad construction of that concept"); *cf.* Ulman Memorandum at 5 ("[I]t could be argued that the Smithsonian is . . . an arm of the Congress itself . . . ."). Others have classified it as a creature of the government of the District of Columbia. *See, e.g.*, David P. Currie, *The Smithsonian*, 70 U. Chi. L. Rev. 65, 67–68 & n.14 (2003). Others have described the Smithsonian as "a private institution under the guardianship of the [federal] Government." *The Status of the Smithsonian Institution under the Federal Property and Administrative Services Act*, 12 Op. O.L.C. 122, 123 (1988) (quoting Chief Justice Taft as Chancellor of the Smithsonian's Board of Regents); *see also* Ulman Memorandum at 5 ("it could be argued that the Smithsonian is . . . a body entirely separate from the government of the United States utilized to fulfill trust obligations"); *Dong*, 125 F.3d at 879 (suggesting that the Smithsonian might accurately be classified as "a testamentary trust *res*"). We have advised that "[t]he unique nature of the Smithsonian counsels reluctance toward a sweeping declaration of the Smithsonian's status within the federal government. The wiser course, which we and others have followed, is to focus upon the position of the Smithsonian within a precise statutory scheme." *Status of the Smithsonian Institution*, 12 Op. O.L.C. at 123–24. We follow that course today.

The history of the Smithsonian suggests that Congress created the entity outside the Executive Branch. In 1836, Congress enacted legislation to accept the bequest of James Smithson, a wealthy English scholar and scientist, who bequeathed all his property to the United States to found "an Establishment for the increase and

diffusion of knowledge among men." Smithsonian Letter at 3 (quoting Smithson will). *See generally* Act of July 1, 1836, ch. 252, 5 Stat. 64; *The Smithsonian Legacy to the United States*, 3 Op. Att'y Gen. 383 (1838). In 1846, Congress created the Institution as an "establishment" to "have perpetual succession," *see* Act of Aug. 10, 1846, ch. 178, § 1, 9 Stat. 102, 102, created a Board of Regents to conduct the business of the Institution consistent with the terms of the Smithson will, *id.* § 3, 9 Stat. at 103, and provided that the funds would be held in the Treasury to support the Institution, *id.* § 2, 9 Stat. at 102.

It appears that Congress accepted the bequest and established the Institution under its constitutional power to legislate for the District of Columbia, *see* U.S. Const. art. I, § 8, cl. 17. 1 *The Smithsonian Institution: Documents Relative to Its Origin and History, 1835–1899*, at 396 (William J. Rhees ed., 1901) ("There was but one power in the Constitution under which this charity could be administered, and that was as a local legislature for the District of Columbia.") (statement of Rep. Alexander D. Sims, Apr. 28, 1846); *id.* at 560 ("[T]he action of Congress in accepting the bequest, and agreeing to carry it into execution, was justified at the time on the ground of its peculiar and complete jurisdiction over the District of Columbia.") (quoting House Committee Report, Mar. 3, 1855). It seems unlikely that Congress would have relied on this particular power—to act as a local legislature for the federal seat of government—if it had intended to establish the Smithsonian within the Executive Branch of the national government. At the time of the Smithsonian's founding, many doubted that the Executive Branch had the constitutional authority to administer such a charitable trust. *Id.* at 130 (suggesting that the Executive lacked authority to "assum[e] and fulfill[] . . . the high and honorable duties involved in the performance of the trust committed with it") (quoting report of House select committee, Jan. 19, 1836); *see also id.* at 471 ("The Smithsonian Institution is not a department of the Government . . . .") (statement of Sen. Jefferson Davis) (Jan. 30, 1851); *Status of the Smithsonian Institution*, 12 Op. O.L.C. at 123 (quoting Chief Justice Taft's statement, made as Chancellor of the Smithsonian's Board of Regents, that "the Smithsonian Institution is not, and never had been considered a government bureau").

Congress's intent to establish the Smithsonian outside the Executive Branch is clear from its governing structure. The President appoints none of the Institution's seventeen board members. Fifteen of its members are either members of Congress or congressional appointees; its remaining members are the Chief Justice and the Vice President. 20 U.S.C. §§ 42–43 (2000). As the D.C. Circuit has observed, "if the Smithsonian were to wield executive power, the method by which its Regents are appointed would appear to violate the Constitution's separation of powers principles." *Dong*, 125 F.3d at 879; Ulman Memorandum at 5 ("[I]f the Smithsonian were an 'executive agency' this mode of appointment might raise serious constitutional questions, in the sense that the Congress cannot appoint executive officers . . . ."). In addition, if the Board of Regents exercises a portion of the sovereign power of the United States, this manner of selection would violate the

Appointments Clause, which vests in the President alone the power to appoint "all . . . Officers of the United States" and does not permit Congress to appoint even "inferior Officers." U.S. Const. art. II, § 2, cl. 2. It would also run afoul of the Incompatibility Clause, which forbids members of Congress from holding "any Office under the United States." *Id*. art. I, § 6, cl. 2.

Moreover, the President exercises no control over the Smithsonian and has no power to remove its board members. *See Dong*, 125 F.3d at 879 ("[T]here is no evidence that the Secretary of the Smithsonian answers to the President . . . ."); Ulman Memorandum at 5 (Smithsonian is "under no executive power of control or appointment whatever"). Instead, Congress presumably retains the ability to remove those members it appoints. *See generally President's Removal Power* at 3 ("[T]he fundamental principle applicable in removal cases is that, absent contrary indications, the power to appoint implies the power to remove."). Indeed, Congress did remove and replace a board member at least once in the Smithsonian's history. *See* Act of Feb. 21, 1863, Pub. Res. No. 37-21, 12 Stat. 825 (removing and replacing a Board member for "giving aid and comfort to" the Confederacy). If the Smithsonian were in the Executive Branch, the President's inability to supervise its operation through removal of its Board members, and Congress's authority over the Institution, would implicate fundamental separation of powers principles. *Dong*, 125 F.3d at 879; *see generally Bowsher*, 478 U.S. at 726, 730.

Finally, structural and functional aspects of EIGA indicate that the Smithsonian is not part of the Executive Branch for purposes of the Act. As noted above, OGE is the supervising ethics office for the Executive Branch, while the Legislative and Judicial Branches have their own supervising ethics offices. Members of Congress and the Chief Justice fill seven of the positions on the Institution's Board of Regents. If the Smithsonian fell within OGE's jurisdiction, OGE would exercise authority over members of Congress and the Chief Justice in their capacity as Regents. Moreover, OGE's ability to conduct its ethics programs under title IV of EIGA ultimately relies on the President's authority to supervise the Executive Branch. OGE's Director is required to monitor compliance with EIGA's requirements and may order an agency or its employees under OGE's jurisdiction to take corrective action when necessary. 5 U.S.C. app., EIGA § 402(b)(9). If the OGE Director concludes that an agency has not adequately investigated or dealt with an ethics violation, or if an agency head is himself the subject of an investigation, the Director is to report directly to the President. *Id.* § 402(f)(1)(B), (f)(2)(A)(ii)–(iv), (f)(3)(B). Those notification provisions would make little sense if applied to entities and persons, such as the Smithsonian and its board members, over which the President has no removal or disciplinary authority. *See* S. Rep. No. 100-392, at 16 (1988) (report on reauthorization of OGE) ("[I]n the final analysis, the OGE Director's enforcement authority lies with his or her powers of persuasion *and ability to appeal to the President* and the public.") (emphasis added).

While the Smithsonian's place in the taxonomy of government may not be entirely clear, it is certainly not within the Executive Branch for purposes of EIGA.[4] *See Status of GPO and Smithsonian* at 2 ("The Smithsonian Institution is not within the Executive branch of the Government."); Ulman Memorandum at 5 ("It is readily apparent that the Smithsonian, . . . under no executive power of control or appointment whatever, is not within the Executive branch."). Therefore, we conclude that OGE's authority to administer the Executive Branch ethics program does not extend to the Smithsonian.

## III.

Our conclusion that OGE does not supervise the Smithsonian under EIGA is consistent with longstanding practice. Before EIGA's passage, standards of ethical conduct for Executive Branch employees were governed by Executive Order 11222, 3 C.F.R. 130 (1965 Supp.). That order outlined rules relating to conflicts of interest, outside employment, receipt of gifts, and financial disclosure, to be administered by agency heads and the Civil Service Commission. The Institution first adopted standards of conduct in October 1961. Smithsonian Letter at 2. Shortly after issuance of the Executive Order, the Smithsonian issued revised standards "[p]ursuant to and in conformity with sections 201 through 209 of the United States Code, Executive Order 11222," and the regulations implementing the order, "set[ting] forth minimum standards of conduct" for Smithsonian employees. Smithsonian Institution Standards of Conduct, 31 Fed. Reg. 4512 (Mar. 17, 1966). Those regulations were published annually in the Code of Federal Regulations. *See* 36 C.F.R. pt. 500 (1966–1983).

Shortly after Congress enacted EIGA, the Smithsonian sought OGE's opinion about whether its board members and employees were subject to the financial disclosure requirements of EIGA. OGE concluded that, because the Smithsonian was not in the Executive Branch, EIGA's disclosure requirements for Executive Branch employees did not apply. Memorandum for Peter G. Powers, General Counsel, Smithsonian Institution, from Bernhardt K. Wruble, Director, Office of

---

[4] We do not address whether the Smithsonian might be deemed part of the federal government or an executive agency for other statutory purposes. In a 1988 opinion, for example, this Office concluded that the Smithsonian was an "executive agency" for purposes of the Federal Property and Administrative Services Act ("Property Act"). *The Status of the Smithsonian Institution under the Federal Property and Administrative Services Act*, 12 Op. O.L.C. 122 (1988). That determination rested on the Property Act's particular legislative history. Section 201(c) of the Property Act, which granted authority to "any executive agency," replaced an earlier statute that had explicitly covered the Smithsonian. Because the legislative history of section 201(c) indicated that it was meant to "preserve all . . . existing authority," we concluded that the Smithsonian was included within its reach. *Id.* at 126 (quotation marks omitted). By contrast, there is no indication that the Executive Branch ethics program that existed before EIGA was meant to encompass the Smithsonian. *See* Exec. Order No. 11222, 3 C.F.R. 130 (1965 Supp.); *see generally* S. Rep. No. 95-170, at 28–31 (1977) (describing the ethics program that existed before EIGA).

Government Ethics, *Re: Ethics in Government Act of 1978* (Apr. 13, 1979). OGE informally reaffirmed that conclusion in 1990, *see* OGE Letter at 6, and continues to abide by it today. Thus, during the thirty years since enactment of EIGA, OGE has not asserted jurisdiction over the Smithsonian or its personnel. OGE has not sought—nor has the Smithsonian submitted—an annual ethics program report, as required of executive agencies under 5 U.S.C. app., EIGA § 402(e). Nor has the Smithsonian sought OGE's guidance in resolving ethics questions. *See* OGE Letter at 6–7; Smithsonian Letter at 1.

Following the passage of EIGA, the Smithsonian continued to publish its own ethics regulations, which did not refer to OGE or EIGA. The Institution ceased to publish the regulations in 1984. The Smithsonian's General Counsel explained:

> The Smithsonian Institution is not a government agency as that term is traditionally used, but for a number of years the Standards of Conduct for Smithsonian employees . . . have been published in the format of government agency regulations as Part 500 . . . of Title 36 of the Code of Federal Regulations. Part 500 . . . [is] obsolete and [is] being removed from Title 36 of the Code of Federal Regulations. Henceforth, in keeping with the Institution's status, current Standards of Conduct for Smithsonian employees . . . will be promulgated internally . . . .

49 Fed. Reg. 9171 (Mar. 12, 1984); *see also* Smithsonian Institution, *Smithsonian Directive 103, Smithsonian Institution Standards of Conduct* (Feb. 13, 2006) (current ethics standards).

Since then, Congress has amended EIGA and reauthorized OGE without modifying the definitions of "executive branch" or "executive agency," and without taking other action to bring the Smithsonian within OGE's jurisdiction. *See, e.g.*, An Act to Reauthorize the Office of Government Ethics, Pub. L. No. 100-598, 102 Stat. 3031 (1988); Office of Government Ethics Authorization Act of 1996, Pub. L. No. 104-179, 110 Stat. 1566; *see also* An Act to Amend the Ethics in Government Act of 1978, Pub. L. No. 98-150, 97 Stat. 959 (1983). Congress's repeated decisions not to amend the scope of OGE's jurisdiction provide further evidence that Congress did not intend for the Institution to be under the supervision of OGE. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change . . . .").

JOHN P. ELWOOD
*Deputy Assistant Attorney General*
*Office of Legal Counsel*