M. Angela **LENGERICH**, Aubrey M. Tokarz, Executor of the Estate of Stephen P. Ehrenfried and Devin A. Ehrenfried, Plaintiffs,

v.

**COLUMBIA COLLEGE**, and the United States Department of Education, Defendants.

No. 07 C 1595.

United States District Court, N.D. Illinois, Eastern Division.

June 22, 2009.

David A. Epstein, Attorney at Law, Chicago, IL, for Plaintiffs.

Barry Francis Macentee, Renee O'Neill Kelly, Hinshaw & Culbertson, Ann L. Wallace, AUSA, United States Attorney's Office, Chicago, IL, for Defendants.

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge.

Before the Court is Defendant Columbia College's (the "College") motion to dismiss Counts IV, V and VI of Plaintiffs' Amended Complaint, which alleges that the Col-

lege and the United States Department of Education (the "Department") violated several sections of the Privacy Act, 5 U.S.C. § 552a, *et seq.* The College also moved for sanctions against Plaintiffs and their counsel, arguing that the Amended Complaint is frivolous and that Plaintiffs filed the complaint in violation of FED. R.CIV.P. 11. Also before the Court is the Department's motion to dismiss Counts I, II and III of the Amended Complaint. Because both motions to dismiss involve similar issues and arise from the same underlying events, the Court shall decide them concurrently. For the following reasons, the College's motion to dismiss is granted with prejudice, the Department's motion to dismiss is granted with prejudice and the College's motion for sanctions is denied.

## I. BACKGROUND

### A. FACTS

The Court takes the following facts from the Amended Complaint. At all relevant times Devin A. Ehrenfried ("Devin") was a full-time student at Columbia College in Chicago. Am. Compl. ¶ 3. Her parents are M. Angela Lengerich ("Lengerich") and Stephen P. Ehrenfried ("Ehrenfried"), who is deceased and thus represented by the executor of his estate, Aubrey M. Tokarz (the "Executor"), who is also a named Plaintiff. *Id.* ¶¶ 4–6.

In 2004 and 2005 Devin applied for and received federal financial aid to finance her education at Columbia. *Id.* ¶ 11. As part of the financial aid process, Devin was required to complete a Free Application for Federal Student Aid ("FAFSA"), which the Department designed to determine how much financial support a student's parents are able to contribute toward the student's education. *Id.* ¶ 12. To do so, the FAFSA requires the student's parents to provide certain financial information

from the prior tax year. *Id.* ¶¶ 12–13, 18. The resulting amount is called the Expected Family Contribution, or EFC. *See* Def. U.S.'s Mot. to Dismiss, Ex. 1, FAFSA [hereinafter, "FAFSA"] at 6. The student's financial need, then, is the difference between the student's EFC and the school's cost of attendance. FAFSA at 6.

To receive federal aid during the 2006–2007 school year, Devin requested that her father, Ehrenfried, complete the relevant portions of her FAFSA. *Id.* ¶ 13. Unfortunately, while in the process of completing the forms, Devin's father was hospitalized and died unexpectedly from an aortic tear. *Id.* ¶¶ 13–14. Devin therefore turned to her mother, Lengerich, for assistance with her FAFSA. Lengerich contacted the Department's help line to determine what information was necessary to complete Devin's FAFSA. *Id.* ¶ 18. As alleged, an official with the Department informed Lengerich that for Devin to receive funding for the 2006–2007 school year, she would have to supply her father's financial information since during the prior tax year Devin was only a dependent of her father. *Id.* So, using her father's financial information, Devin completed and filed her FAFSA in May 2006. *Id.* ¶ 19. In July 2006, she received an award letter from the College announcing that she would receive a financial aid package that covered nearly all of her tuition for the 2006–2007 year. *Id.* ¶ 20.

That same month, the College's Financial Aid Office began to verify the information that Devin reported on her FAFSA. The College assigned Pearl Natali ("Natali") to head the process. *Id.* ¶ 21. As part of the verification process, Natali requested from the Executor copies of Ehrenfried's tax returns and driver's license. *Id.* ¶ 22. The Executor complied with Natali's request sometime in August 2006. *Id.* In September 2006 Devin inquired

about the status of her financial aid award, and the Financial Aid Office assured Devin that they would apply the federal funds to her College account. *Id.* ¶ 23. But a few months later, in November 2006, the College notified Devin that she would not be allowed to register for the Spring semester because the Financial Aid Office had placed a hold on her account. *Id.* ¶ 24.

In December 2006, as alleged, an unidentified individual in the College's Financial Aid Office notified the Executor that Ehrenfried's financial information was no longer valid, and thus Lengerich would have to provide her financial information on Devin's FAFSA. *Id.* ¶ 27. The Executor asked the College to explain this new request, but received no response. *Id.* ¶¶ 29–30. The Executor then spoke with an alleged supervisor in the Financial Aid Office, who reiterated that Lengerich would have to provide her financial information on Devin's FAFSA to finalize the application process. *Id.* ¶¶ 33–34. Lengerich therefore consulted with her attorneys and eventually agreed to provide the Financial Aid Office with copies of her 2005 federal income tax return and Illinois driver's license; though, for an unstated reason, Lengerich provided these documents in redacted form. *Id.* ¶ 37. Devin filed in the Financial Aid Office a new FAFSA, with her mother's redacted financial information, on December 8, 2006. *Id.* ¶ 38.

On December 12, 2006 Natali contacted the Executor and told her that the Financial Aid Office could not accept Lengerich's financial information in redacted form. *Id.* ¶ 40. Two days later, on December 14, 2006, Natali again contacted the Executor and explained that she would return Devin's FAFSA so that Lengerich could provide her complete financial information and resubmit the forms by January 12, 2007. *Id.* ¶ 41. Lengerich received the incomplete forms only a few days before

the January 12, 2007 deadline, but nevertheless complied with Natali's request. *Id.* ¶¶ 43–47. On the same day, however, a supervisor at the Financial Aid Office contacted the Executor and explained that he would be returning to the Department the financial aid award that Devin previously received. *Id.* ¶ 47.

Given the situation, Lengerich attempted to contact several College officials, but received no response. *Id.* ¶¶ 51–52. The Executor contacted the College's general counsel, but the general counsel refused to meet with the Executor. *Id.* ¶¶ 53–54. Lengerich next contacted the Department's help-line, through which an unknown representative allegedly told Lengerich to submit Devin's FAFSA as soon as possible. *Id.* ¶ 56. Lengerich filed an updated FAFSA directly with the Department in January 2007. *Id.* ¶ 58. In the end, Devin was not provided federal financial aid for the 2006–2007 academic year. Despite having no federal aid, the College allowed Devin to register for classes and treated her tuition as unpaid debt. *Id.* ¶¶ 61. The College, recognizing the unpaid debt, allegedly referred Devin's account to a collection agency, which injured her credit rating. *Id.* ¶ 62.

Devin completed the 2006–2007 academic year and, eventually, earned enough academic credits to qualify for a Bachelor of Arts degree from the College. To finance the Fall semester of the 2007–2008 academic school year, which she spent in Florence, Italy, Devin and her mother completed and filed an additional FAFSA. *Id.* ¶ 64. She qualified for a federal financial aid award, but because the College listed Devin as not in good standing, the Financial Aid Office refused to issue Devin her federal funds. *Id.* Lengerich took out private loans to cover Devin's tuition for the 2007–2008 school year. *Id.* ¶ 65. And, despite her completion of the required aca-

demic credits, the College refused to grant Devin a bachelor's degree since her 2006–2007 tuition remained unpaid and outstanding. *Id.* ¶ 66.

## B. PROCEDURAL HISTORY

Plaintiffs originally operated pro se and filed this case on March 22, 2007, alleging fourteen violations of the Privacy Act against the College, Natali, the President of the College, the Vice President of Campus Environment at the College, the General Counsel of the College, the Vice President and Chief Financial Officer of the College and the Executive Director of the Financial Aid Office at the College. The case was originally assigned to U.S. District Judge Mark Filip.

Two weeks later, on April 6, 2007, citing a slew of cases, Judge Filip gave Plaintiffs fifteen days to show cause why their case should not be dismissed as a matter of law because federal courts typically had been unwilling to treat corporations or other private entities as federal agencies for purposes of the Privacy Act. Judge Filip noted that "Plaintiffs have not alleged that Columbia College nor any of its employees are 'agencies' for the purposes of Section 552a ..." and thus "Plaintiffs' claims against Defendants appear to be materially improper in a way that cannot be cured by additional pleadings, at least not seemingly within the confines of Fed.R.Civ.P. 11." *See* Filip Minute Order of April 6, 2007 at 2. On April 23, 2007 Plaintiffs filed a brief in response, thereby complying with Judge Filip's order to show cause.

On April 25, 2007, after considering Plaintiffs' response, Judge Filip dismissed with prejudice all claims against the individual defendants, making the College the only remaining defendant in the case. *See* Filip Minute Order of May 1, 2007 at 1–2. Thereafter, the College moved to dismiss Plaintiffs' complaint, citing Judge Filip's

April 6, 2007 order and arguing that the College was not a governmental "agency" that fell within the Privacy Act's purview. Despite having doubts as to the veracity of Plaintiffs' Privacy Act claims, Judge Filip, on June 19, 2007, denied the College's motion to dismiss, stating that the court "explained to Plaintiffs that their case as framed appears to be non-viable under extensive federal precedent because Columbia College in Chicago is seemingly not an 'agency' of the United States government, as the Privacy Act requires." *See* Filip Minute Order of June 19, 2007 at 1 [citations omitted]. Judge Filip went on:

> Plaintiffs make clear that they intend to pursue this case. Rule 12(b)(6) is a generous rule for plaintiffs, and the Court cannot say, conclusively, as a matter of law, that the claim against Columbia College could never be proved consistent with applicable legal rules. If Plaintiff intends to actually spend time and money on discovery in this case, it is not this Court's place to second-guess their litigation judgment. Perhaps they will succeed; perhaps they are throwing good money after bad. Discovery and further proceedings will be required to see which result adheres.

*Id.* at 1–2. On September 24, 2007 the College filed an answer to the complaint. Then, on March 6, 2008, the Northern District's Executive Committee transferred the case to this Court.

On July 29, 2008 the College filed a motion for summary judgment, arguing once again that Plaintiff's Privacy Act claims are invalid because the College is not and could not be considered an "agent" of the United States for purposes of the Privacy Act. Plaintiffs filed a response to the College's motion (this time represented by counsel) and at the same time filed a motion seeking leave to file an amended complaint. On September 4, 2008, relying

on the myriad cases set forth in Judge Filip's April 6, 2007 order, the Court granted the College's motion for summary judgment. That same day, the Court granted Plaintiffs leave to file an amended complaint.

Plaintiffs filed an amended complaint on November 7, 2008, adding the Department as a defendant and alleging in conclusory fashion that the College was an agent of the Department. On November 17, 2008 the College moved to dismiss the amended complaint, arguing once again that it was not a federal agency and therefore not liable under the Privacy Act. The College also filed a motion for sanctions, asserting that the amended complaint was frivolous given the previous rulings by Judge Filip and this Court. Both motions are fully briefed and before the Court. On April 30, 2009 the Department also filed a motion to dismiss, which the College adopted in part. The Court set a briefing schedule as to the Department's motion, but Plaintiffs failed to file a brief in response. The Court shall decide the Department's motion based on the arguments stated therein.

## II. DISCUSSION

### A. STANDARD OF DECISION

When determining the sufficiency of a complaint, we take the allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). When reviewing a motion to dismiss under Rule 12(b)(6), the court merely looks at the sufficiency of the complaint, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Johnson v. Rivera*, 272 F.3d 519, 520–21 (7th Cir.2001), it does not decide whether the plaintiff has a winning claim. *See McCormick v. City of Chi.*, 230 F.3d

319, 323–26 (7th Cir.2000) (citing *Leatherman v. Tarrant County*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)).

Rule 8(a) requires that a complaint contain a short plain statement of the claim showing that the pleader is entitled to relief. Fed.R.Civ.P. 8(a). To pass muster on a 12(b)(6) motion, however, this short plain statement must satisfy "two easy-to-clear hurdles." *E.E.O.C. v. Concentra Health Serv., Inc.*, 496 F.3d 773, 776 (7th Cir.2007). First, the complaint's factual allegations must be enough to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir.2007); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Second, the complaint must also contain sufficient allegations based on more than speculation to state a claim for relief that is plausible on its face. *Concentra Health Serv., Inc.*, 496 F.3d at 776.

### B. THE PRIVACY ACT

■ The purpose of the Privacy Act is to protect citizens against the improper disclosure of personal information that governmental agencies maintain. *United States v. Carter Family Trust*, 602 F.Supp. 82, 85 (N.D.Ind.1985). To that end, the Privacy Act provides "certain safeguards for an individual against an invasion of personal privacy by establishing certain requirements for Federal agencies...." *Marzen v. U.S. Dep't of Health & Human Serv.*, 632 F.Supp. 785, 799 (N.D.Ill.1986) (citing Privacy Act of 1974, Pub.L. No. 93–579 § 2(b) (1974)). In case of a violation, the Act provides for certain civil remedies. Specifically, it states:

> [w]henever any agency ... fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse

effect on an individual ... the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this subsection.

5 U.S.C. § 552a(g)(1)(D).

Plaintiffs are seeking to hold the College and the Department liable under three separate Privacy Act provisions, § 552a(e)(1), (e)(3) and (e)(5), all of which apply only to governmental agencies "that maintain[ ] a system of records" with respect to United States citizens. *See* 5 U.S.C. §§ 552a(a)(2), 552a(e). Section 552a(e)(1) requires governmental agencies to maintain in their records only that information about an individual that is relevant and necessary to accomplish the agency's purpose. Section 552a(e)(3) requires an agency to inform the recipient of a request for information the agency's authority for soliciting that information, the purpose for which the information is going to be used, the routine uses for the information and the effects on the individual if he or she chooses not to provide the information. *See* § 552a(e)(3)(A)-(D). Section 552a(e)(5) requires that an agency maintain all individual records accurately and completely "to assure fairness to the individual" as the agency makes its required determination. With these provisions in mind, the Court turns to whether Plaintiffs can maintain a claim under the Privacy Act against either the College or the Department.

#### C. The College is Not An Agent of the Department

█ It is undisputed that only federal "agencies" can be held liable under the Privacy Act. *See id.* (referencing when an agency violates one of the statute's provisions); *Polchowski v. Gorris,* 714 F.2d 749, 752 (7th Cir.1983) (noting that the Privacy Act "applies only to agencies of the United States Government"); *see also Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 124 (2d Cir.2008) ("This Court, joining many of its sister Circuits, has accordingly held that the private right of civil action created by the Privacy Act is specifically limited to actions against agencies of the United States government.") (citing *Pennyfeather v. Tessler,* 431 F.3d 54, 56 (2d Cir.2005)); *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1447 (9th Cir.1985); *Schmitt v. City of Detroit,* 395 F.3d 327, 329–31 (6th Cir.2005) (holding that the Privacy Act applies exclusively to federal agencies). Therefore, a threshold question for this Court to decide, as a matter of first impression, is whether the College—a private institution—is an agent of the United States because of its participation in a federal student financial assistance program. In the end, if we find that the College is not a governmental "agency" as defined by the statute, then the College is free to operate outside the confines of the Privacy Act. To begin, the Court must look to the Privacy Act's definition of "agency."

█ The Privacy Act outlines the term "agency" by referencing the Freedom of Information Act ("FOIA"). That statute defines "agency" as:

[A]ny executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency.

5 U.S.C. § 552(f). Considering this definition, the only statutory phrase under which the College could possibly fall is "Government controlled corporation." But there is no clear explanation, either in the statute or in the cases interpreting the statute, of what it means to be a "Government controlled corporation." Instead, when deciding whether an entity is a "Gov-

ernment controlled corporation," courts have observed that "each new arrangement must be examined anew and in its own context." *E.g., Burch,* 551 F.3d at 124 (citing *Pub. Citizen Health Research Group v. Dep't of Health, Educ. & Welfare,* 668 F.2d 537, 542 (D.C.Cir.1981)). This means that courts will analyze the connections between the entity and the federal government, considering specifically: (1) the federal government's control over the entity; and (2) the entity's independent authority to make decisions. *See DeHarder Inv. Corp. v. Ind. Hous. Fin. Auth.,* 909 F.Supp. 606, 616–17 (S.D.Ind. 1995). If these connections rise to a sufficient level, then it is possible that a reviewing court will deem the entity an "agency" of the United States for purposes of the Privacy Act.

In 1974 Congress excluded from its definition of "Government controlled corporation" those entities that received appropriated federal funds, but were neither chartered by the federal government nor controlled by it. *Irwin Mem'l Blood Bank of the S.F. Med. Soc'y v. Am. Nat'l Red Cross,* 640 F.2d 1051, 1054 (9th Cir. 1981) (citing the Congressional record). Following this exclusion, government oversight became a significant factor in determining whether a seemingly private entity was a "Government controlled corporation." A few years later, expanding on the concept of what it meant to be controlled by the federal government, the United States Supreme Court in *Forsham v. Harris,* 445 U.S. 169, 100 S.Ct. 977, 63 L.Ed.2d 293 (1980) explained that "[b]efore characterizing an entity as 'federal' for some purpose, [the] Court has required a threshold showing of substantial federal supervision of the private activities, and not just the exercise of regulatory authority necessary to assure compliance with the goals of the federal grant." *Id.* at 180 n. 11, 100 S.Ct. 977 (citing

*United States v. Orleans,* 425 U.S. 807, 818, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976)). After *Forsham,* it was no longer an easy task for a party to show that a private entity was, in actuality, a federal agency. And, even now, the task is no less difficult for Plaintiffs.

In support of their position, Plaintiffs allege a series of unsupported legal conclusions in an attempt to establish that the College is either an *"alter ego"* of the Department or an agent of the Department. Specifically, Plaintiffs allege that the Department delegated to the College, through a written contract, "the duty and authority to administer certain federal loan programs and to approve or deny, on behalf of the Department, certain applications for federal loans and aid by students and by their parents as an agent of the [Department]." Compl. ¶ 9. Plaintiffs further allege that the Department conferred upon the College broad discretion to apply and to implement the Department's policies with respect to the federal loan applications that it received. *Id.* Plaintiffs go on, alleging that the Department "designated the College as the sole administrator of federal aid and loan programs," which, in turn, converted the College and its employees into *"de facto* extensions or *alter egos"* of the Department. *Id.* ¶ 10.

■ Taken at face value, these allegations attempt to establish that the College served as an independent arm of the Department without any oversight or supervision. According to Plaintiffs, through this authority a private entity such as the College would simply "assume the government role," and thus become a governmental "agency" under the Privacy Act. But this assertion goes too far. The College's alleged decision-making authority only satisfies one part of the inquiry. Recall that to find that an entity is controlled by the

government, a court must consider not only the entity's independent authority to make decisions, but also the federal control to which the entity is subject. Here, Plaintiffs' complaint fails to allege sufficient governmental control over the College, which is critical to this determination.

■ As alleged, the College operates with absolutely no governmental oversight, supervision or direction.[1] In fact, it is undisputed that the College is a wholly private institution.[2] It is not organized pursuant to a federal charter or Act of the United States. It is not subject to annual audits or financial oversight. Its management, board of directors and other employees are not appointed by the President or other federal officers. Its employees are not federal employees. Its interactions with the United States are limited, and it has no rulemaking authority. Without any significant connections between the College and the federal government, the argument that the College is somehow an "agency" of the United States is substantially weakened.

For instance, in *Public Citizen Health Research Group*, the court determined whether the National Capital Medical Foundation ("NCMF") was an "agency" for purposes of FOIA. 449 F.Supp. 937, 939–40 (D.D.C.1978). The court ultimately found that the NCMF exercised considerable decision-making authority, on a daily basis, in meeting its statutory obligations to the Department of Health, Education and Welfare, a federal agency with which the NCMF contracted. *Id.* But this alone

did not make it an "agency" under FOIA. Rather, the court took into account several factors that connected the NCMF with the United States and found these factors decisive of the issue. For instance, the NCMF was a creature of federal statute. It was financed by the government. It performed an executive function. And, it operated under "direct, pervasive, continuous regulatory control affecting even minutia of the procedures and functions." *Id.* at 941. These factors, coupled with NCMF's decision-making authority, made it an "agency" for purposes of the FOIA. But none of these factors exist in this case, even under the most liberal reading of Plaintiffs' complaint.

This case is more akin to *Burch v. Pioneer Credit Recovery*, in which the Second Circuit affirmed the dismissal of plaintiff's Privacy Act claim because the plaintiff alleged only a few weak connections between the defendant and the federal government. 551 F.3d at 125. As in this case, *Burch* involved a defendant that contracted with federal agencies. In light of these contracts, the plaintiff argued in support of her Privacy Act claim that the defendant performed a government function and thus was an "agency" of the United States. *Id.* The court rejected this argument, however, finding that "[t]hese allegations do not amount to a sufficient level of oversight, supervision, and government connection to lead us to believe that [defendant] should be considered an 'agency.'" *Id.* (citing *Forsham*, 445 U.S. at 180, 100 S.Ct. 977).

---

**1.** The College touts itself as "an independent and unaffiliated institution of higher education." See Mission Statement of Columbia College Chicago, *available at http://www.colum.edu/About_Columbia/Mission.php* (last visited on June 18, 2009).

**2.** A search on the Illinois Secretary of State website reveals a corporation filing for Co-

lumbia College Chicago, of which the Court takes judicial notice, indicating that the College is a nonfederally-chartered, not-for-profit corporation registered in the State of Illinois. According to the College's corporate filing, it is an active corporation and is in good standing with the State.

Taking it a step further, a few years prior to *Burch* the D.C. Circuit reversed the denial of a motion to dismiss and held that the Smithsonian Institution was not an "agency" of the federal government for purposes of the Privacy Act. *Dong v. Smithsonian Inst.*, 125 F.3d 877, 879–80 (D.C.Cir.1997). This was so, even though the Smithsonian operated under a federal charter, had a workforce that consisted of 70% federal employees, received extensive federal funding, submitted annual financial statements to Congress, enjoyed federal immunity and received representation from the U.S. Department of Justice. *Id.* at 880. In rejecting these federal connections, the court found it significant that the statute's definition of "agency" listed four specific categories of federal "agencies," while using a catch-all phrase to encompass *"other* establishment[s] in the executive branch." *Id.* at 879 [emphasis in original]. This phrase, according to the court, evidenced Congress's intent to limit liability to those entities within the executive branch, and thus any entity outside of the executive branch would not qualify as an agency, "even if it could be shoehorned into the concept of a 'Government controlled corporation.'" *Id.* In the end, because the Smithsonian was not an establishment of the executive branch, it was not a federal "agency" that could be held liable under the Privacy Act. *Id.* at 880.

These cases are instructive, although in this case there is far less government control. In this light, to say that the College performed the duties of the Department or somehow bound the Department as its agent and independent arm is entirely implausible. Under the circumstances, Plaintiffs' conclusory allegations with respect to the College are not enough to convert it into an "agency" of the United States. *Burch,* 551 F.3d at 125; *Dong,* 125 F.3d at 879–81; *Ehm v. Nat'l R.R. Passenger Corp.,* 732 F.2d 1250, 1254–55

(5th Cir.1984) (holding that Amtrak was not a "Government controlled corporation," though it maintained federally-appointed employees and was subject to limited financial oversight, because the degree of federal control was not "sufficient in and of itself to negate Amtrak's character as a private, nonfederally-chartered corporation"); *Irwin Mem'l Blood Bank of the S.F. Med. Soc'y,* 640 F.2d at 1057–58 (holding that the American Red Cross was not a "Government controlled corporation," even in light of characteristics that indicated federal control); *St. Michael's Convalescent Hosp. v. State of Cal.,* 643 F.2d 1369, 1373–74 (9th Cir.1981) (rejecting argument that use of federal funds pursuant to federal regulations transformed entity into a federal agency); *Rocap v. Indiek* 539 F.2d 174, 177 (D.C.Cir.1976) (finding Federal Home Loan Mortgage Corp. to be a federal "agency" because it was federally chartered, its board of directors consisted of federally-appointed officers and it was subject to federal audits and daily supervision); *DeHarder,* 909 F.Supp. at 617 (finding Indiana Housing Finance Authority was not a federal agency because it was not federally-chartered, the state appointed its directors and it was subject to almost no federal supervision over its business transactions); *Krebs v. Rutgers State Univ. of N.J.,* 797 F.Supp. 1246, 1255–56 (D.N.J.1992) (finding that Rutgers University is not a "Government controlled corporation" despite its entanglement with the government); *Dennie v. Univ. of Pittsburgh Sch. of Med.,* 589 F.Supp. 348, 352 (D.Vi.1984) (dismissing complaint because plaintiff alleged nothing to show substantial federal control or supervision over university hospital and medical school to characterize them as "federal" for Privacy Act purposes). Accordingly, Counts IV, V and VI of Plaintiffs' amended complaint

against the College are dismissed with prejudice.

The Court adds that it has given Plaintiffs an opportunity to amend their complaint once before. And, while FED. R.CIV.P. 15(a) states that leave to amend should be granted "when justice so requires," a court generally will deny a motion to amend in instances of futility, undue delay, bad faith or undue prejudice to the non-moving party. *Burch,* 551 F.3d at 126 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). In this instance, any proffered amendments to Plaintiffs' complaint with respect to its Privacy Act claims against the College would be futile. It is clear that any additional pleading would not affect the Court's analysis as to whether the College is an "agency" of the federal government. As such, the Court finds it appropriate to grant the College's motion and to dismiss Plaintiffs' Privacy Act claims with prejudice.

### D. THE DEPARTMENT OF EDUCATION IS NOT LIABLE UNDER THE PRIVACY ACT

█ In finding that the College is not an "agency" of the government for purposes of the Privacy Act, the Court can deal with Plaintiffs' claims against the Department summarily. In its motion to dismiss, to which Plaintiffs failed to respond, the Department points out that over 7,000 schools across the United States participate in federal financial assistance programs, authorized by Title IV of the Higher Education Act of 1965 ("HEA"), to enable their students to meet the costs of attendance. The HEA and the Department's regulations outline the schools' obligations with respect to their participation in these programs.

Section 487(a)(3) of the HEA requires the institution to "establish and maintain such administrative and fiscal procedures and records as may be necessary to ensure proper and efficient administration of funds received from the Secretary or from students under this title...." 20 U.S.C. § 1094(a)(3). The Department argues, then, that under the HEA it is not the responsibility of the Department to ensure efficient administrative procedures for the program, but instead it is the responsibility of the participating school. In this way, it is legally incorrect to label these participating schools federal agencies. They are simply entities that contracted with the Department in order to participate in the financial assistance programs. Thus, to find that the College is an agent of the Department would potentially convert thousands of educational institutions into "agents" of the United States for purposes of the Privacy Act. Such a result is unwarranted, and the Court agrees with the Department on this point.

Moreover, the Department avers that dismissal is proper because the allegations do not address the Department's maintenance of records. Turning again to the statute, § 552(e) applies only to a governmental agency that "maintains a system of records." *See* 5 U.S.C. § 552(e). Here, Plaintiffs do not and cannot allege that the Department maintained the records that the College collected from Devin, Lengerich and the Executor. Instead the allegations focus solely on the conduct of the College as the custodian of records. As a result, because the College is not an "agent" of the Department, the Department could not have failed to maintain any records in compliance with the relevant subsections of § 552(e). The Department cannot be liable under the Privacy Act in this instance. For these reasons, Counts I, II and III of Plaintiffs' amended complaint against the Department are dismissed with prejudice.

### D. MOTION FOR SANCTIONS

Finally, the Court turns to the College's motion for Rule 11 sanctions. The standard for imposing Rule 11 sanctions is an objective determination of whether the party's conduct was reasonable under the circumstances. *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 752 (7th Cir.1988). Through this inquiry Rule 11 allows a court to impose sanctions if the responding party or his counsel should have known that his position was groundless. *CNPA v. Chi. Web Printing Pressmen's Union No. 7*, 821 F.2d 390, 397 (7th Cir.1987). Notably, the Rule "enables the court to protect itself, and the litigants in other cases, from the burdens of frivolous or vexatious filings." *Frantz v. U.S. Powerlifting Fed'n*, 836 F.2d 1063, 1066 (7th Cir.1987).

In support of its motion, the College argues that Plaintiffs filed an amended complaint that suffered from the same defects as their original complaint, of which Judge Filip made them aware. The College argues that Plaintiffs knew that the existing law with respect to federal agencies did not support their Privacy Act claims against the College, but they sued the College anyway. Plaintiffs, however, disagree. They assert that the amended complaint adds several allegations that support their theory that the College was an *"alter ego"* of the Department. Plaintiffs insist, then, that because their claims do not mirror those of the original complaint, they are neither baseless nor frivolous. The Court sides with Plaintiffs on this point.

Plaintiffs' amended complaint under the circumstances was not unreasonable. In response to Judge Filip's previous rulings and to this Court's grant of summary judgment, Plaintiff introduced a new theory into the case—the *"alter ego"* or *"quasi-agency"* theory. This new theory may have been ineffective, but that does not necessarily equate to a failure to comply with FED.R.CIV.P. 11. In the end, there is nothing to show that Plaintiffs knew that the allegations in their amended complaint were groundless. The College's request for sanctions is denied.

### III. CONCLUSION

For these reasons, Columbia College's motion to dismiss Counts IV, V and VI of Plaintiffs' Amended Complaint is granted with prejudice. The Department of Education's motion to dismiss Counts I, II and III of the Amended Complaint is granted with prejudice. Columbia College's motion for sanctions against Plaintiffs and their counsel is denied.

IT IS SO ORDERED.