NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0141n.06

No. 20-3913

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Apr 01, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JAMES CYRUS, | ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE |
| v. | ) ) | UNITED STATES DISTRICT COURT FOR THE NORTHERN |
| UNIVERSITY OF TOLEDO, et al., | ) ) | DISTRICT OF OHIO |
| Defendants, | ) ) | OPINION |
| OPPORTUNITIES FOR OHIOANS WITH DISABILITIES, BUREAU OF SERVICES FOR THE VISUALLY IMPAIRED, | ) ) ) | |
| Defendant-Appellant. | ) ) | |

Before: CLAY, DONALD, and NALBANDIAN, Circuit Judges.

CLAY, J., delivered the opinion of the court in which DONALD, J., joined. NALBANDIAN, J. (pp. 18–27), delivered a separate dissenting opinion.

**CLAY, Circuit Judge.** Defendant Opportunities for Ohioans with Disabilities ("OOD"), Bureau of Services for the Visually Impaired ("BSVI"), appeals from the district court's grant of Plaintiff James Cyrus' motion to enforce the settlement agreement, in this case arising under the Randolph-Sheppard Act ("RSA"), 20 U.S.C. § 107, *et seq*, and Ohio's state equivalent, Ohio Admin. Code 3304:1-21-01. For the reasons set forth below, we **AFFIRM** the district court's order enforcing the settlement agreement.

- 1 -

## I.     BACKGROUND

### A.     Factual Background

Congress enacted the RSA in 1936 to "provid[e] blind persons with remunerative employment[.]"  20 U.S.C. § 107(a).  It thus created a statutory framework for "blind persons licensed under the [act] . . . to operate vending facilities on any Federal property."[1]  *Id.*  The act divides responsibility between state and federal agencies and designates a state licensing agency ("SLA") "to issue licenses to blind persons who are citizens of the United States for the operating of vending facilities on Federal and other property in such State for the vending of newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services dispensed automatically or manually and prepared on or off the premises[.]"  20 U.S.C. § 107a(a)(5).  Ohio's statutory equivalent of the RSA is the so-called "mini-RSA."  *State v. United States*, 986 F.3d 618, 621 (6th Cir. 2021).  Ohio's mini-RSA extends priority to blind vendors on all in-state governmental property, which includes the University of Toledo Health Science Campus ("University;" "Health Science Campus").

Plaintiff James Cyrus is a licensed blind vendor in the Business Enterprise Program of BSVI, a division of OOD.  Since 1993, Cyrus has operated various vending machines and grab-and-go food and beverage kiosks at the Health Science Campus under the RSA and Ohio's mini-RSA.

### 1.  The Parties' Contracts

The Bureau-Grantor Agreement and the Operator Agreement govern the parties' relationships.  In 1993, OOD and the Health Science Campus entered into an initial Grantor

---

[1] The statute defines a "vending facility" as "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment as the Secretary may by regulation prescribe[.]"  20 U.S.C. § 107e(7).

Agreement; an additional Grantor Agreement was executed in June 2018 ("2018 Grantor Agreement"). Under the 2018 Grantor Agreement, a "licensed blind vendor," i.e., Cyrus, was granted "the exclusive right to operate a combination coffee kiosk and sandwich stand[.]" (Grantor Agreement, Ex. B, R. 2-1, PageID # 42). The Grantor Agreement obligates the signatories (and, derivatively, Cyrus[2]) to perform specific duties. For example, BSVI is required to "provide [to the blind vendor] any necessary equipment, initial supplies, and other services necessary[.]" (Grantor Agreement, Ex. B, R. 2-1, PageID # 42). Likewise, BSVI is also required to make sure that the blind vendor "offers a variety of coffee, coffee drinks, smoothies, tea, sandwiches, and other food products and provides choices of bread, meats, cheeses[,] and toppings for customizable sandwich options." (*Id.* at PageID # 43). While the University is not responsible for maintenance or repair of BSVI-owned equipment, it agreed to "[e]nsure that all food storage space can be locked and/or appropriately secured by OOD/BSVI's Vendor to prevent tampering or theft." (*Id.* at PageID # 45). The parties shared a "[j]oint[]" obligation "to maintain the security of the premises." (*Id.* at PageID # 46).

The other relevant contract is the Operator Agreement. Ohio Admin. Code 3304:1-21-01(G)–(H). Cyrus entered into a 1993 Operator's Agreement with BSVI; the contract assigned Cyrus Facility #304, which includes multiple vending sites, including a kiosk known as Market Café, on the Health Science Campus.[3] A 2010 Operator Agreement superseded the 1993 version and remains in effect.

---

[2] At the district court, the parties disagreed as to whether Cyrus was an intended beneficiary or an incidental beneficiary to the Grantor Agreement. This question is not argued on appeal.

[3] Consistent with the mini-RSA, Cyrus' compensation is derived from the net profits. (Ex. A, R. 2-1, PageID # 37).

## 2. Issues Arise

The long-standing relationship between Cyrus, the University, and OOD soured once Cyrus expanded his food-services operation to include a catering component. The Grantor Agreement does not directly mention catering services, but it envisions "delivery services." (Grantor Agreement, Ex. B, R. 2-1, PageID # 43). Even though the agreement itself does not specify catering, Cyrus asserts that University personnel and BSVI representatives assured him that the Grantor Agreements posed no barrier to him expanding his services with a catering component. In reliance on these representations, Cyrus avers that he purchased University-approved catering equipment, invested personal financial resources, and hired employees, including an executive chef, a sous-chef, and an operations manager. Soon after catering operations commenced, the University protested, contending that the parties' contracts did not contemplate catering.[4] The University food service employees' union filed a grievance and agreed with the University that the pre-existing collective bargaining agreement prevented Cyrus from engaging in catering activities. Frustrated with the union's position, Cyrus filed suit and sought injunctive relief from the district court to continue the catering operations.

Separately, at some point in early 2019, Cyrus and his staff noticed missing inventory from the unlocked storage area used by Cyrus on the Health Science Campus. Consistent with its statutory duty under the mini-RSA, OOD provided Cyrus with an initial inventory for the kiosk in July 2018. Ohio Admin. Code 3304:1-21-05(C). This inventory was stored in the University's Mumford Library basement, adjacent to the food preparation area. The storage space had a pull-down metal security partition; however, the University had not installed a hasp to accommodate a

---

[4] The University of Toledo runs its own catering operation, called the Food and Nutrition Services. (Catering Policy, Ex. A, R. 12-1).

padlock. Because there were no active security cameras, the storage area remained unlocked and unwatched.

Cyrus attests that he has been instructed over the years that absent an emergency, a vendor should not contact the police directly about vending operations but should go through OOD's local representative. Accordingly, as indicated below, beginning at least in February 2019, Cyrus notified Lynette Hustwick, OOD's local representative, of the missing inventory and the lack of security:

> **February 1, 2019**: Lyn, When are we going to be able to access the security camera's by the coffee kiosk? Amy is reporting that there are a number of items that are showing up missing.
>
> **May 1, 2019**: Lyn, We are still seeing a large amount of theft from the Market Café. Deena the manager is reporting whole bottle of syrups are waking from upstairs and over the weekend the staffs tip money was stolen from the Market Café. It look like bags of coffee are being stolen as well. I not sure if they are being taken from downstairs or from upstairs at this point . . . Our food costs/Starbucks inventory costs are running well above what it should be. The matter of theft and security cameras need to be addressed.
>
> **May 5, 2019**: Hi Lyn; Theft has been reported again and again to both UT and [the Bureau] . . . The clear attitude that I have gotten from both UT and [the Bureau] about theft, is at best total indifference . . . What immediate steps will UT and BEP be taking to help in this matter?
>
> **June 14, 2019**: Hi Lyn; FYI; we had Starbucks deliver a pallet of product yesterday and we had to order another pallet for delivery next week. Do we have a date certain on securing the storage area yet?
>
> **August 22, 2019**: Hi Lyn; We are still seeing stuff missing in the large storage room. David is reporting that there is at least (150 five hours energy drinks missing from the large storage room this morning. They are stored right behind the cages that we have the Starbucks inventory stored.

(Pl.'s Br. at 6–7 (quoting Mot. to Enforce Settlement Agreement, R. 41-1, PageID ## 572–76) (verbatim e-mail communications)). A hasp was eventually installed to secure the inventory

storage area on July 17, 2019. After the installation, Cyrus reports that the loss of missing inventory came to an end.[5]

## B.       Procedural History

On August 2, 2019, Cyrus filed his complaint for injunctive relief and a motion for a temporary restraining order ("TRO") against Defendants: (1) Sharon Gaber, the President of the University of Toledo; (2) the University of Toledo; (3) Kevin Miller, Director of OOD; (4) Gregory Dormer, Director of the BSVI; and (5) the BSVI, a component of OOD. Defendants opposed the TRO. Defendants Miller, Dormer, OOD, and BSVI (i.e., all Defendants other than Gaber) filed a joint response in opposition, contending that the district court lacked subject-matter jurisdiction, that Cyrus had failed to exhaust administrative remedies, and that the request for injunctive relief should be denied on the merits. Separately, Defendant Gaber and the University of Toledo filed an opposition to the motion for a TRO, advancing similar defenses.

On August 20, 2021, Cyrus filed his amended complaint for injunctive relief against the University of Toledo, BSVI/OOD, and American Federal of State, County, and Municipal Employees ("AFL-CIO") Local 2415. He asked the district court to enjoin Defendants from preventing Cyrus from engaging in catering activities through the kiosk. The district court postponed the August 7, 2019 hearing on the motion for a TRO so the parties could discuss a settlement, following which, all defendants other than Defendant OOD were dismissed.

### 1.  The Settlement Agreement

The parties engaged in settlement negotiations on September 23, 2019, which ostensibly ended in a mutual agreement between OOD and Cyrus. Matthew Lampke, Chief Counsel for

---

[5] However, Cyrus notes, beverage items were noticed to be missing in August 2019, i.e., after the hasp was installed. Cyrus determined that the theft occurred prior to the installation of the hasp but was not detected because the box was in a concealed location, hidden from view.

OOD, recited into the record the settlement agreement. The parties agreed to four principal terms, summarized below.

*First*, the parties agreed that Cyrus would discontinue catering services but offer an expanded menu at the kiosk and that OOD would supply a new convection oven:

> As between OOD and UT, the parties have agreed to return to the previous business model under the Bureau Grantor Agreement. This would include removing food delivery, but it would include such items as pre-made sandwiches, single servings, made-to-order items, [D]anishes, cookies, donuts, and grab-to-go. This is subject to the health department inspection[,] and that no hood would need to be installed in order to return to the previous business model.

(Tr., R. 33, PageID # 365).

*Second*, the parties agreed that OOD would give Cyrus an inventory credit adjustment for unused catering items:

> As between OOD and Mr. Cyrus, the parties have agreed to conduct an inventory of the open food that was obtained for the food delivery catering service, and will conduct a count out/price out in the next week or two, and pay the inventory up to $5,000.

(*Id.*).

*Third*, and the basis of the appeal, the parties agreed that OOD would give an inventory credit adjustment for Starbucks products stolen from the Market Café if Cyrus provided "adequate documentation:"

> With regards to OOD and Mr. Cyrus and the claim of lost inventory of up to $15,000, on Mr. Cyrus' supplying of adequate documentation, which would include police reports, receipts and pricing, OOD would pay up to $15,000[6] for the loss [of] inventory, subject to [Ohio Vendors Representative Committee ("OVRC")] active participation. And that would -- Mr. Cyrus would provide those receipts within the next week or so, and then OOD would seek out the active participation with OVRC thereafter, and make

---

[6] On November 15, 2019, about three months after the settlement negotiations concluded, the Ohio Vendors Representative Committee voted to provide up to $15,000 for lost product to settle the lawsuit.

payment on after that active participation had concluded, on agreement on the adequate documentation.

(*Id.* at PageID # 366).

*Fourth*, Cyrus agreed to dismiss this suit and his grievance with prejudice:

And, finally, with regards to the entire lawsuit, Mr. Cyrus would agree to dismiss this suit and his grievance with prejudice, the grievance being against OOD for failure to advocate, and to release all causes of action against any party to this action arising from the coffee kiosk at the UT Medical College Campus.

(*Id.* at PageID ## 365–66).  After a ten-minute, off-the-record discussion, Lampke clarified:

Additionally, to clarify that UT and OOD will clarify the [Bureau-Grantor Agreement] itself and negotiate the terms.  The terms will not include an all-inclusive made-to-order for all items, but may include certain items that would be made-to-order.

The discussion of the lost inventory up to $15,000 will be a credit to Mr. Cyrus' inventory and not a payment to him.

And, finally, the release discussed does not include any other pending actions or grievances between Cyrus and OOD, other than what was discussed.  And just to clarify, what was discussed was this pending lawsuit and the grievance filed regarding the underlying matter in this lawsuit for failure to advocate on the coffee kiosk.

(*Id.* at PageID # 367).  Another off-the-record discussion led to the following clarification:

With respect to the inventory for which Mr. Cyrus will be credited, there will be documentations available to -- it will be supplied to OOD, and finalization of the settlement will be subject to agreement with respect to Mr. Cyrus -- between Mr. Cyrus and OOD with respect to that issue.

(*Id.* at PageID # 369).

## 2.  Post-Settlement Disagreements

After the settlement agreement, Cyrus informed OOD that he could not produce police reports documenting that he (or his employees) ever called the police to report the theft of the Starbucks products.  At the district court's behest, OOD asked the campus police department to search its telephone logs and incident reports.  That search yielded just one police report of loose

relevance, memorializing an employee's report of $40 missing from a tip-jar.[7]  However, other documentation was forthcoming; Cyrus provided OOD with documentation establishing the value of the lost inventory: (1) a list of items Cyrus purchased to replace missing coffee; (2) the written communications, excerpted above, that Cyrus sent Hustwick regarding the missing inventory; and (3) copies of all related receipts, which amounted to $7,118.79.

### 3. Motion to Enforce Settlement Agreement

On June 4, 2020, Cyrus had not yet received an inventory credit and thus filed a motion to enforce settlement seeking a $7,118.79 credit adjustment from Defendant OOD for the inventory loss.  The parties waived a hearing and discovery related to the disputed issues.  The district court granted Cyrus' motion on July 28, 2020, finding the settlement agreement as a whole and the term "adequate documentation" unambiguous, and the agreement did not require Cyrus to provide police reports.  OOD appeals that order and asks this Court to reverse the district court's judgment and dismiss this case with prejudice.

## II.  DISCUSSION

### A.  Standard of Review

"This Court reviews for clear error the district court's factual determination that the parties had agreed to settlement terms; however, we review the district court's decision to grant a motion to enforce the settlement based on its preliminary factual finding for an abuse of discretion."  *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645 (6th Cir. 2001) (citing

---

[7] Why there are no additional police reports is not entirely clear.  It is unlikely that the University of Toledo Policy Department simply failed to create a report (indeed, the defense points out that all police calls generate incident or police reports in a record-management system).  What seems more likely is that Cyrus informed OOD of the thefts and incorrectly assumed that OOD informed University police on his behalf.  (Pl.'s Br. at 7 ("Based on what Ms. Hustwick reported to Cyrus, and based on his own observations, Ms. Hustwick contacted Hospital Security on multiple occasions following Cyrus' reports of theft."))

another source). "A district court abuses its discretion when it applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact." *United States v. Fowler*, 819 F.3d 298, 303 (6th Cir. 2016) (quoting another source)).

"Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law." *Smith v. ABN AMRO Mortg. Grp. Inc.*, 434 F. App'x. 454, 460 (6th Cir. 2011) (citation omitted). "Under Ohio law, 'a valid settlement agreement . . . requir[es] a meeting of the minds as well as an offer and acceptance.'" *Id.* (quoting *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 683 N.E.2d 337, 338 (1997)). "Where a contract's meaning is clear on its face, that meaning controls." *In re AmTrust Fin. Corp.*, 694 F.3d 741, 750 (6th Cir. 2012). To determine whether a contract's meaning is clear on its face, we "consider the language of the agreement, the context in which that language appears and other traditional canons of construction." *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 441 (6th Cir. 2007). No evidentiary hearing is required where an agreement is clear and unambiguous, and no issue of fact is present. *Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). "If, after applying these rules of interpretation, the contract remains ambiguous," meaning a contractual provision is subject to two reasonable interpretations, then the parties' original understanding of the contract's terms may be ascertained through extrinsic evidence. *Prater*, 505 F.3d at 441; *Shifrin v. Forest City Enters., Inc.*, 597 N.E.2d 499, 501 (1992). If disputed material facts exist, then an evidentiary hearing is generally compulsory. *Kukla v. Nat'l Distillers Prods., Co.*, 483 F.2d 619, 622 (6th Cir. 1973).

### B.    Analysis

Factually, this case is straightforward: OOD argues that Cyrus supplying police reports was a condition precedent needed before it would issue a credit adjustment. Cyrus disagrees and insists

that he has complied with the agreed-upon obligation to provide adequate documentation proving the value of the inventory loss.  Recall the relevant part of the agreement states:

> With regards to OOD and Mr. Cyrus and the claim of lost inventory of up to $15,000, on Mr. Cyrus' supplying of adequate documentation, which would include police reports, receipts[,] and pricing, OOD would pay up to $15,000 for the loss [of] inventory, subject to [Ohio Vendors Representative Committee ("OVRC")] active participation.  And that would -- Mr. Cyrus would provide those receipts within the next week or so, and then OOD would seek out the active participation with OVRC thereafter, and make payment on after that active participation had concluded, on agreement on the adequate documentation.

(Tr., R. 33, PageID # 36).  Choppy as this oral agreement is, the district court found the term "adequate documentation" unambiguous (a finding OOD does not challenge).  In particular, the district court held that all the agreement envisioned was that Cyrus would provide "evidence sufficient to establish the value of the lost inventory."  (Order, R. 42, PageID # 609).  Cyrus did so when he provided a list of replacement coffee items he purchased, receipts of replaced inventory amounting to $7,118.79, and e-mail correspondence to OOD regarding the missing inventory.

The basic question is whether the settlement agreement defines "adequate documentation" to require all three documentary categories ("police reports, receipts[,] and pricing").  The more nuanced question is whether the list of "police reports, receipts[,] and pricing" functions as a limitation on the preceding term, "adequate documentation"—and thus, when coupled with the use of the conjunctive "and," indicates that each of the three categories of documentation was required.  Alternatively, does the phrase "which would include," regardless of the subsequent use of the word "and," indicate that the list of "police reports, receipts[,] and pricing" are non-exhaustive examples of "adequate documentation."  The record appears to support the latter interpretation.

A three-pronged approach guides this Court's analysis.  First is a brief discussion of some relevant legal principles regarding the nature and enforceability of settlement agreements.  Second, to determine whether "police reports" were a required condition precedent to OOD's performance,

the settlement agreement transcript is reviewed to understand the full context in which OOD agreed to provide a credit-inventory adjustment. Third is a contractual interpretation of the meaning of the following emphasized terms: "Mr. Cyrus' supplying of adequate documentation, *which would include* police reports, receipts[,] *and* pricing." (Tr., R. 33, PageID # 366 (emphasis added)).

### 1. Legal Principles Concerning Settlement Agreements

This Court has long recognized that district courts retain "broad, inherent authority and equitable power" to enforce settlement agreements. *Bostick Foundry Co. v. Lindberg, Div. of Sola Basic Indus., Inc.*, 797 F.2d 280, 282–83 (6th Cir. 1986) (citation omitted). Here, by granting the motion to enforce the settlement agreement, the district court determined there was an offer, acceptance, and meeting of the minds and that an enforceable agreement existed, thereby prompting OOD's specific performance. Circuit courts are reluctant to disrupt settlement agreements. For example, the Tenth Circuit would not "derail a settlement agreement expressly resolving payment, release, and dismissal terms because of alleged disputes over additional terms." *Gates Corp. v. Bando Chem. Indus., Ltd.*, 4 F. App'x 676, 686 (10th Cir. 2001). The Eighth Circuit similarly stated: "The fact that the parties left some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." *Sheng v. Starkey Labs., Inc.*, 117 F.3d 1081, 1083 (8th Cir. 1997). This is precisely the scenario here. Counsel left some unspecified details that would need to be ironed out before the case could be dismissed, i.e., the precise value of the credit adjustment. That OOD is unhappy with the fruits of those subsequent discussions cannot be used as a basis to rescind a valid settlement agreement.

###### 2.    Context of Agreement to Provide Inventory Credit

On appeal, OOD asserts that the district court abused its discretion by committing clear error in transforming "police reports" from a required precondition to OOD's performance into an optional term. But when reading the settlement agreement transcript in its entirety, we find OOD's argument that "police reports" were required specious.

OOD argues it agreed in detrimental reliance on Cyrus' representation at the mediation that he would provide all three categories of information to validate his allegations of theft. Contrary to OOD's assertion, nothing in the settlement agreement indicates that the parties' discussion of "police reports" was aimed at substantiating that a theft occurred. OOD contends that Cyrus must provide at least two police reports in order to prove that a theft occurred; however, the word "theft" does not even appear in the settlement proceedings transcript (nor, for that matter, do the words "stolen," "steal," or any other synonym indicating improper appropriation). More generally, and as a normative matter, a police report would not necessarily substantiate a theft. All a police report does is verify that someone called the police. Some other proof, such as video evidence, might be required to confirm the theft; but such evidence was not envisioned by the settlement agreement and was also not possible since the University had not activated the surveillance cameras.

Moreover, a careful review of the settlement agreements indicates the centrality not specifically of "police reports" but of "receipts" or other documentation. The sentence after the "police reports, receipts[,] and pricing" sentence is illuminating; it states that Cyrus would "provide *those* receipts within the next week or so . . . and [then OOD would] make payment." (Tr., R. 33, PageID # 366 (emphasis added)). The word "those" refers to the "police reports, receipts[,] and pricing." A plain reading of the agreement strongly suggests that all Cyrus needed to provide was documentation establishing the value of the lost inventory. Cyrus did so when he

provided receipts indicating lost inventory of $7,118.79, far less than the agreed-upon ceiling of $15,000. It would be a bridge too far to argue that Cyrus supplying "police reports," a term which appears only once in the settlement agreement, was a mandatory condition to issuing the credit.

It is also unclear from where OOD draws its assertion that Cyrus was required to produce "police reports that *he personally filed with the police* to substantiate his claimed losses from alleged thefts." (Def.'s Br., R. 12 at 8 (emphasis added)). Nothing in the transcript states that any police report Cyrus would supply must be those he personally filed. Additionally, OOD argues that the district court ignores the plain and ordinary meaning of the term "police reports." Yet the defense pleadings fail to identify the definition upon which the district court relied; nor does OOD offer the plain and ordinary meaning of the term (though OOD is correct that the term is unambiguous).

The purpose of the adequate documentation was to confirm the amount lost; nowhere in the settlement agreement does OOD appear to dispute that the loss occurred. Cyrus provided adequate documentation in the form of receipts and e-mails sent to OOD's local representative reporting missing inventory. In combination, these documents established the value of the missing merchandise and fulfilled the bargained-for term of "adequate documentation."

### 3. Contractual Interpretation

The remaining discussion is devoted to the contractual interpretation of the phrase "which would include" and the term "and," following the term "adequate documentation" in the settlement agreement. (Tr., R. 33, PageID # 366).

> With regards to OOD and Mr. Cyrus and the claim of lost inventory of up to $15,000, on Mr. Cyrus' supplying of adequate documentation, *which would include* police reports, receipts[,] *and* pricing, OOD would pay up to $15,000 for the loss inventory, subject to OVRC active participation. And that would -- Mr. Cyrus would provide those receipts within the next week or so, and then OOD would seek out the active

participation with OVRC thereafter, and make payment on after that active participation had concluded, on agreement on the adequate documentation.

33, PageID # 366 (emphasis added)).

### a.  Meaning of the Phrase "Which Would Include"

The first interpretive question is the meaning of "include" in the language reading: "adequate documentation, which would include police reports, receipts[,] and pricing."

Defendant insists that "'adequate documentation' shall include the production of 'police reports.'" (Reply Br., ECF No. 19 at 6).  This interpretation contorts the settlement agreement too much.  "Include" is inclusionary and a term of expansion rather than limitation.  Put differently, the word "include" ushers in a list of examples of adequate documentation.  Nowhere does the transcript indicate that any one of those categories is required or essential.

Reading the word "include" as introducing a non-exhaustive list of examples is consistent with Sixth Circuit precedent.  Even where a contract contains more mandatory language, such as "shall include," the Sixth Circuit finds that the phrase "demonstrates that the list . . . is not exhaustive."  *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 434 (6th Cir. 2021) (citing *Samantar v. Yousuf*, 560 U.S. 305, 317 (2010) ("It is true that use of the word 'include' can signal that the list that follows is meant to be illustrative rather than exhaustive.")).

Applying the foregoing to this case, the phrase "which would include police reports, receipts[,] and pricing" indicates that the list is non-exhaustive and merely introduces examples of adequate documentation.  The settlement agreement reads that if any documentation were adequate alone, it would be unnecessary to provide additional, duplicative documentation.  The use of the word "include," in conjunction with the fact that the settlement agreement lacks emphatic indication that each of the three categories is required, supports affirming the district court's order.

**b.** **Meaning of the Word "And"**

The use of the word "and" in the settlement agreement's phrase, "police reports, receipts[,] *and* pricing," does not undermine the preceding analysis. It is true that the general rule is that the word "and" should be understood in its "'ordinary' conjunctive sense." *OfficeMax*, 428 F.3d at 589 (citing another source). However, just as well established is that "and" can be either conjunctive or disjunctive depending on the fuller context. *Noell v. Am. Design, Inc.*, 764 F.2d 827, 833 (11th Cir. 1985) (citation omitted) ("It is an established princip[le] [t]hat the word 'or' is frequently construed to mean 'and,' and *vice versa*, in order to carry out the evident intent of the parties."). As the Fifth Circuit artfully put it: "[T]he word 'and' is not a word with a single meaning, for chameleonlike, it takes its color from its surroundings." *Peacock v. Lubbock Compress Co.*, 252 F.2d 892, 893 (5th Cir. 1958).

By way of example, the Sixth Circuit has interpreted the word "and" in the disjunctive when reviewing a telecommunications statute. *Officemax*, 428 F.3d at 588. That statute defined "communications services" as "local telephone service, toll telephone service, *and* teletypewriter exchange service." *Id.* (emphasis added). "And" connoted the disjunctive because those three communications services were "generally mutually exclusive and because no service exists that can satisfy all three definitions at once." *Id.*

The Eleventh Circuit embraced a similar approach when reviewing a retirement plan under which an employee forfeited accrued benefits if he were found "guilty of committing theft, fraud or embezzlement . . . *and* if he [was] determined to have disclosed or released to third parties the Employer's trade secrets." *Noell*, 764 F.2d at 829 (emphasis added). "And" was read in the disjunctive because, if it were given its literal interpretation, then the forfeiture clause would only be triggered where an employee was first found guilty of theft, fraud, or embezzlement and *then*

later disclosed trade secrets to a third party. *Id.* at 833 ("It would be unreasonable to conclude that an employer, who has provided its employees with benefits in excess of those required by law, would place such an onerous burden on itself with respect to the termination of the benefits."). So, even though the policy clearly used the word "and," the Eleventh Circuit held it to mean that *either* a conviction of theft, fraud, or embezzlement *or* disclosing trade secrets to third parties were alone sufficient to revoke the accrued benefits.

The rationales animating *Officemax* and *Noell* extend to this case. Any one of the three example categories of adequate documentation, i.e., "police reports, receipts[,] and pricing," alone might be sufficient to pinpoint the exact amount of lost inventory. The word "and" in the phrase "police reports, receipts[,] and pricing" signifies the disjunctive because any three of those categories could establish what amount, under the agreed-upon ceiling of $15,000, OOD would be required to credit Cyrus' inventory.

## III. CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgment of the district court.

No. 20-3913, *Cyrus v. Univ. of Toledo, et al.*

**NALBANDIAN, Circuit Judge, dissenting.** I agree with the majority that this case turns on the interpretation of the settlement agreement. The relevant provision provides that Cyrus would receive reimbursement for lost inventory on his "supplying of adequate documentation, which would include police reports, receipts and pricing." (R. 33, PageID 36.) The question here is whether this provision required Cyrus to provide "police reports" before he can be reimbursed. The majority answers no. But the text, context, and Cyrus's own actions compel the opposite conclusion. For this reason, I respectfully dissent.

I.

A.

Begin with the text. The main interpretive question centers around what kind of list "include" introduces. Courts have come out in different ways on this question. Sometimes they interpret "include" to introduce a non-exhaustive, illustrative list of examples. *See In re Hartman*, 443 N.E.2d 516, 517 (Ohio 1983); *see also Samantar v. Yousuf*, 560 U.S. 305, 317 (2010). But at other times, they interpret it to introduce an exhaustive list to which nothing can be added. *See Bellemar Parts Indus., Inc. v. Tracy*, 725 N.E.2d 1132, 1136 (Ohio 2000); *see also Premier Health Care Invs., LLC v. UHS of Anchor, L.P.*, 849 S.E.2d 441, 450-53 (Ga. 2020) (looking at state and federal cases); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text* 132-33 (2012) (explaining that while the verb "include" "introduces examples, not an exhaustive list," "the courts have not invariably so held").

Here the majority concludes that "include" introduces an illustrative list. Maj. Op. at 15. But I think three interpretive clues point to the exhaustive reading. First, the list here contains

specific items without a unifying theme, and courts, including the Ohio Supreme Court,[1] have given "include" an exhaustive reading in a similar context. Second, "include" here is modified by the verb "would," making it mandatory and not illustrative. Finally, the list is joined by the conjunctive "and," which further supports the exhaustive reading. I address each in turn.

*Specific List*. Take the first interpretive clue, the type of list. When "include" introduces a specific list, courts tend to read it as being exhaustive. *See Tracy*, 725 N.E.2d at 1136. And that's especially true when the list includes examples of things that are unrelated, without a general unifying principle. *See Dong v. Smithsonian Inst.*, 125 F.3d 877, 880 (D.C. Cir. 1997). This makes sense. After all, if the drafters of a document have thought of specific examples, it is likely that they wanted those examples to be included and others excluded.

Consider these cases. In *Tracy*, the Ohio Supreme Court was asked to decide whether "employment services" constitute "things transferred . . . in a manufacturing operation" under the sales tax exemption statute. 725 N.E.2d at 1136. The statute defined "thing" to "include[] all transactions included in" three specific subdivisions of the statute. *Id.* Those subdivisions didn't mention "employment services," and so the court held that employment services weren't "things transferred." *Id.* In reaching this conclusion, the court explained that the Ohio General Assembly "chose to include only those three specific service transactions." *Id.* It didn't matter that the list of specific transactions was introduced by "include." *See id.* at 1137 (Stratton, J., dissenting in part) (arguing that "thing" encompasses "employment services" because "include" introduces "an illustrative list"). So the Ohio Supreme Court has given "include" an exhaustive reading when it introduces a specific list of examples.

---

[1] As the majority correctly points out, the agreement is governed by Ohio law. Maj. Op. at 10.

And so has the United States Supreme Court. In *Carcieri v. Salazar*, the Court read a list that followed "shall include" to be exhaustive because the categories were "discrete." 555 U.S. 379, 391-92 (2009). The question was whether a specific tribe fell within the definition of "Indian" under the Indian Reorganization Act. *Id.* at 382. Under the statute, "Indian . . . shall include" one of three categories.[2] *Id.* at 388 (quoting 25 U.S.C. § 465). The government argued that by using "shall include," Congress did not mean to exhaust all definitions but left a gap for the government to define. *Id.* at 391. But the Court disagreed. *Id.* It found that Congress "explicitly and comprehensively defined the term" because it "includ[ed] only three discrete definitions." *Id.* at 392. And it further explained that if Congress had meant for "include" to "encompass" other tribes than the ones listed, then it "would have not needed to enact these additional statutory references to specific Tribes." *Id.* In other words, when Congress uses a list of specific examples to define a term, then the list is exhaustive—even when introduced by "include."

And the D.C. Circuit has also read a specific list that follows "include" as exhaustive. *See Dong*, 125 F.3d at 880. The court was asked to consider if the Smithsonian was covered by the definition of "agency" under the Privacy Act. *Id.* at 877. Under the statute, "agency . . . includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch . . . or any independent regulatory agency." *Id.* at 878 (quoting 5 U.S.C. § 552(f)). The plaintiff argued that because the statute uses the word "include," the court should read it as being non-exhaustive. *Id.* at 880. But the D.C. Circuit disagreed. *Id.* It recognized that "'includes' normally does not introduce an exhaustive

_____

[2] The provision stated in full: "The term 'Indian' as used in this Act shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood . . . ." 25 U.S.C. § 465.

list," but it found that the specific categories do not have a "general principle" unifying them, so it didn't give include its illustrative reading. *Id.* So when the list following "include" is composed of different items, without a general unifying principle, then the list is meant to be exhaustive and not illustrative.

So too here. The terms "police reports, receipts, and pricing" are all specific categories without a general principle unifying them. Receipts show whether Cyrus bought the items that he alleges were stolen. As for pricing, those go to how much the missing items cost. And finally, police reports provide evidence that the items were, in fact, stolen.[3] The three are specific categories that prove different things about the alleged theft. The parties thought of these examples, agreed to them, and should be bound by them.[4]

*Would Include.* A second interpretive clue further supports an exhaustive reading. In the relevant provision, the word "include" is modified by the verb "would." (R. 33, Settlement Tr., PageID 366.) So we should interpret the phrase "would include" as a whole. After all, in Ohio, courts interpreting a contract "may not ignore the existence of *any* word or phrase." *State ex rel. Harris v. Rubino*, 119 N.E. 3d 1238, 1245 (Ohio 2018) (emphasis added). Rather, they should give every word its "ordinary meaning" and avoid "rewriting the contractual agreement of the parties." *Miller v. Marrocco*, 504 N.E.2d 67, 67 (Ohio 1986).

---

[3] The majority seems to think that a police report only proves that someone filed a report with the police. Maj. Op. at 13. But I disagree. When an item of value is stolen, it is typical to report it to the police. And, generally, false reporting is a separate crime. *See* Ohio Rev. Code § 2917.32. So it is reasonable to think that OOD would have wanted police reports as evidence to confirm the alleged thefts. Admittedly, police reports might not be the best way to prove that a theft has actually occurred. But the parties thought they were a good enough measure, and we shouldn't substitute our own judgment for theirs.

[4] This is especially the case here because the terms of the settlement agreement were recited into the record. So the parties knew of the terms. This was not a case in which these terms were part of boilerplate language in the contract.

So what kind of list does "would include" introduce? An exhaustive one where every item is required. This is because the term "would" is the past tense of "will." 20 *The Oxford English Dictionary*, 344 (2d ed. 1989). And "will" denotes certainty. *See id.* at 344 ("An inclination *to do* something, as contrasted with power or opportunity."); *Merriam-Webster's Collegiate Dictionary* 1433 (11th ed. 2014) (defining "will" as a verb "used to express capability or sufficiency").

To see this, compare "would" and "will" with "could" and "can." If I say, "I *will* visit Paris next month" this means that I, in fact, will visit Paris next month. But if I say, "I *can* visit Paris next month," then I am only expressing a possibility of visiting, not that I will visit. The same is true for "in my prime, I would run five miles a day" compared with "in my prime, I could run five miles a day." In the second example, it is not clear if the speaker actually ran five miles a day; instead, he seems to be expressing only his ability to do so. Thus, the words "would" and "will" represent certainty, where "could" and "can" represent possibility.

And our Court agrees. We have noted the difference between "would" and "could," saying that choosing to use "the term 'would' in place of 'could,' appears rather clearly to have required a greater degree of certainty." *Usery v. Hermitage Concrete Pipe Co.*, 584 F.2d 127, 131 (6th Cir. 1979). Indeed, we explicitly rejected a reading of a statute that "would substitute 'could' for 'would.'" *See Ky. Res. Council, Inc. v. Env't Protection Agency*, 467 F.3d 986, 994 (6th Cir. 2006). So a court should respect the drafter's choice in using "would" instead of "could."

Here the parties made that choice. They agreed that adequate documentation "would include" police reports. They did not say, "adequate documentation that *could include* police reports," which might have made "police reports" only an example in an illustrative list. Instead, they deliberately chose to use the words "would include," and we shouldn't read "could" into the agreement when the parties chose to use "would."

For its part, the majority relies on a recent case from our Court to support its broad reading. *See United States ex rel. Felton v. William Beaumont Hosp.*, 993 F.3d 428, 434 (6th Cir. 2021). There, we noted that a list following "shall include" was "not exhaustive." *Id.* And this would suggest that "would include" also introduces a non-exhaustive list. But *Felton* is distinguishable.

The *Felton* court was emphasizing the broad nature of the relief provision of the False Claims Act. *See* 993 F.3d at 434. That provision provides that "[r]elief . . . shall include reinstatement . . . [two] times the amount of back pay, interest on the back pay, and compensation for any special damages . . . ." 31 U.S.C. § 3730(h)(2). The court interpreted "shall include" to say that the listed remedies were definitely included but that other remedies were also available. *Felton*, 993 F.3d at 434. Importantly, the analysis didn't turn on "shall include" alone. *Id.* Instead, the court also looked to that phrase "in combination with" a separate provision entitling an employee broadly to "all relief necessary." *Id.*

Thus, in light of the surrounding language and context, the *Felton* provision listed optional remedies that the plaintiff may or may not ask for but that had to be available. Here, the mandatory language, in context, introduces requirements that Cyrus must meet before he can be reimbursed.

*The conjunctive.* Finally, one more clue makes this list exhaustive: The use of the word "and." Because the settlement agreement joins "police reports," "receipts," and "pricing" with the conjunctive "and," the parties intended for "would include" to join a list of required items. Had the settlement agreement used the disjunctive "or," then there would be a strong argument that the list is meant to provide examples and Cyrus would not need to submit every item on the list. After all, the word "or" can show that any one item on the list is enough by itself to provide adequate documentation. *See Stone v. Wingo*, 416 F.2d 857, 865 (6th Cir. 1969) (noting that when a statute is written in the disjunctive, "proof of any one" term "is sufficient"). But the agreement uses the

conjunctive "and," so all three items are required. *See* Scalia & Garner, *supra*, at 116 ("With the conjunctive list, all three things are required . . . ."); *cf. United States v. Estrada*, 876 F.3d 885, 887 (6th Cir. 2017) ("Because the requirements are conjunctive, the alien must satisfy all three prongs.").

The majority tells us that "and" can sometimes be used in the disjunctive, to mean "or." That is true in some contexts, but not as a general rule. *See Officemax, Inc. v. United States*, 428 F.3d 583, 588 (6th Cir. 2005) (explaining that Congress sometimes uses "and" in the disjunctive). In fact, this Court, after looking at dictionary definitions, legal usage guides, and case law, concluded that "'and' usually does not mean 'or.'" *Id.* at 589. And Ohio courts too usually interpret "and" in the conjunctive. *Clagg v. Baycliffs Corp.*, 695 N.E.2d 728, 780 (Ohio 1998).

So when does "and" not actually mean "and"? When it would give "an incoherent reading of a statute." *Officemax*, 428 F.3d at 589; *cf.* Scalia & Garner, *supra*, at 234 ("A provision may be either disregarded or judicially corrected as an error . . . if failing to do so would result in a disposition that no reasonable person could approve."). But here, reading "and" in its natural conjunctive sense doesn't lead to any incoherence or absurdity. There is nothing incoherent about OOD wanting police reports along with receipts and pricing before reimbursing Cyrus. As already stated, police reports show whether the items were stolen, and this is different from what the other two items prove. Thus, because the agreement uses "and" to link the list of documentation together, that list is exhaustive, and each is required.

In sum, the text of the settlement agreement required Cyrus to provide police reports before OOD would reimburse him.

B.

Next, turn to the broader context of the agreement. Other provisions of the agreement support the reading that the phrase "would include" introduces a list of required items. That's because when the parties wanted the term "include" to introduce a list of examples, they knew how to provide for it.

For example, in the first term of the agreement, the parties used "would include" twice. They agreed to return to their previous business model, saying "[t]his *would include* removing food delivery, but it *would include such items as* pre-made sandwiches, single service, made-to-order items, danishes, cookies, donuts, and grab-to-go." (R. 33, Tr., PageID 365 (emphasis added.)) In one sentence, the parties used "would include" in an exhaustive sense and an illustrative sense. In the first instance, "would include" introduces only one item, the removing of food delivery. It is hard to see how this can be merely illustrative. Compare this with the second usage, where "such as" follows "would include." Generally, "*such as* is used to introduce examples of a class" as in "for example." 17 *The Oxford English Dictionary* 102 (2d ed. 1989); *see also Maple Drive Farms Ltd. P'ship v. Vilsack*, 781 F.3d 837, 853 (6th Cir. 2015) (explaining that "such as" introduces a non-exhaustive list and means "of this kind" (quoting Bryan A. Garner, *A Dictionary of Modern Legal Usage* 849 (2d ed. 1995))). So when the parties wanted "would include" to be illustrative, they modified it to indicate their intent.

Another provision is also illustrative. The parties agreed that there will be further negotiations over the Bureau Grantor Agreement terms which "will not include an all-inclusive made-to-order for all items but, *may include* certain items that would be made-to-order." (R. 33, PageID 367 (emphasis added).) Here too the parties knew how to give "include" its non-exhaustive reading by adding "may" before it. And as this Court has noted, "[t]he term 'may' . . .

indicate[s] a certain measure of likelihood or possibility." *Old Life Ins. Co. of Am. v. Garcia*, 411 F.3d 605 (6th Cir. 2005).

Thus, the parties knew how to make the term "include" introduce an illustrative list. For the relevant provision that contains "police reports," they used "would include" instead of a different formulation. They did not use "may include," nor did they use "such as" to modify it. And as the Supreme Court has explained, it is "a general rule" that "use of certain language in one part and different language in another can indicate that different meanings were intended." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 155 (2013) (cleaned up). This suggests that when the parties didn't modify "would include," they meant the list that follows to be exhaustive. *See* Scalia & Garner, *supra*, 107 ("The expression of one thing implies the exclusion of others . . . ."). Thus I would read the language to mean what the parties intended it to mean and would find that "would include" introduces an exhaustive list.

## C.

Lastly, consider Cyrus's own conduct. Even if one rejects the reading of the agreement that requires Cyrus to provide police reports, the above analysis at least shows that this reading is a reasonable one. *See Premier Health*, 849 S.E.2d at 448 (explaining that "there is more than one potentially plausible interpretation of 'include'"). And a contract that has more than one reasonable reading is ambiguous. *Alexander Local Sch. Dist. Bd. of Educ. v. Village of Albandy*, 101 N.E.3d 21, 34 (Ohio 4th Dist. 2017). When faced with ambiguous contracts, Ohio courts can look to extrinsic evidence, which includes "any acts by the parties that demonstrate the construction they gave to their agreement." *Id.* And "[e]ven post-contract formation conduct" is "relevant in construing ambiguous contract language." *William Powell Co. v. Onebeacon Ins. Co.*, 75 N.E.3d 909, 917 (Ohio 1st Dist. 2016).

Here Cyrus's actions show how he understood the contract. Cyrus did in fact submit a police report. But that report had nothing to do with substantiating the theft of the items that he wanted reimbursement for. Instead, it was a report about money that was stolen from a tip jar. So it wasn't "adequate documentation" for purposes of the reimbursement provision. But the submission of this police report strongly suggests that Cyrus understood the agreement as requiring him to submit police reports. After all, why else would he submit a police report that had nothing to do with the items he wanted reimbursement for? Thus, even if the settlement provision is ambiguous, which it's not, Cyrus's conduct favors resolving the ambiguity against him.

## II.

The text, context, and Cyrus's own conduct all compel the conclusion that he needed to submit police reports. Because he has not provided adequate police reports, I respectfully dissent.